# Exhibit A

# CO-DEVELOPMENT, LICENSE AND SUPPLY AGREEMENT

This **Co-Development, License and Supply Agreement** (this "**Agreement**") is hereby entered into and as of December 31, 2021 (the "**Effective Date**") by and among Endo Ventures Limited, a company organized under the laws of Ireland, with its registered offices located at First Floor, Minerva House, Simmonscourt Road, Ballsbridge, Dublin 4, Ireland ("**Endo**"), on the one hand, and RK Pharma, Inc., a Delaware corporation having offices at Building 215/215A, 401 North Middletown Road, Pearl River, New York 10965, USA ("**RK Pharma**"), and Apicore Pharmaceuticals Pvt. Ltd., an Indian company with offices at Block No. 252-253, NH228, Dhobikuwa, Gujarat 391440, India ("**Apicore**" and collectively with RK Pharma, the "**RK Parties**"), on the other hand.

## RECITALS

**WHEREAS**, Endo is engaged in the business of developing, manufacturing, marketing and distributing pharmaceutical products;

**WHEREAS**, the RK Parties are engaged in the business of developing, manufacturing and supplying active pharmaceutical ingredients;

**WHEREAS**, Apicore has developed methods for procuring, characterizing and using the API (as defined below); and

**WHEREAS**, Endo and the RK Parties desire to collaborate on the further development of the API, and to have the RK Parties supply commercial quantities of the API to Endo, subject to the terms and provisions of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and agreements hereinafter set forth and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Endo and the RK Parties hereby agree as follows:

## ARTICLE 1.
## DEFINITIONS

Capitalized terms used in this Agreement shall have the following definitions:

"**Additional APIs**" has the meaning set forth in Section 2.3.1.

"**Additional Territories**" has the meaning set forth in Section 2.3.1.

"**Affiliate(s)**" means, with respect to each Party, any Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such Party, solely for so long as such control exists. For purposes of the foregoing definition, "control" (including, with correlative meaning, the terms "controlled by", and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of interests representing equity securities, or partnership interests or by contract, or otherwise, and ownership of more than fifty percent (50%) of such equity securities or partnership interests in a Person shall,

without limitation, be deemed to be control for purposes of this definition. For the avoidance of doubt, the RK Parties are Affiliates of each other.

"**Agreement**" has the meaning given to such term in the first paragraph of this Co-Development, License and Supply Agreement.

"**ANDA**" means an abbreviated new drug application pursuant to 21 U.S.C. § 355(j), seeking approval to market a drug product.

"**Anti-Corruption Laws**" has the meaning set forth in Section 11.3.1.

"**API**" means the active pharmaceutical ingredient Pentosan Polysulphate with a molecular weight distribution of the active pharmaceutical ingredient used in the Reference Listed Drug.

"**Apicore**" has the meaning given to such term in the first paragraph of this Agreement.

"**Apicore DMF**" means, collectively, the DMF for the API, which Apicore shall file with the Regulatory Authorities in the Territory, including such modifications that may be filed from time to time, pursuant to this Agreement.

"**Applicable Laws**" means all laws, rules, regulations and guidelines of any Governmental Authority with jurisdiction over the development, manufacturing, exportation, importation, promotion, marketing, sale or distribution of the API, including specifically all cGMP or similar standards or guidelines of the FDA, other Regulatory Authorities and compendial guidelines (e.g., United States Pharmacopeia), where applicable, as well as U.S. export control laws and the U.S. Foreign Corrupt Practices Act, in each case to the extent applicable to the performance of a Party's obligations under this Agreement.

**"Authorized Person**" has the meaning set forth in Section 2.2.1.

"**Business Day**" means any day other than a Saturday, a Sunday or any day on which commercial banks located in New York City, New York, U.S.A. are authorized or required to remain closed.

"**Calendar Quarter**" means a three (3) consecutive month period ending on March 31, June 30, September 30 or December 31.

"**Certificate of Analysis**" means a certificate of analysis that includes information demonstrating the testing and compliance of each lot of API with the Specifications, as certified by Apicore's or RK Pharma's quality assurance personnel, that certifies each lot of API was made in accordance with cGMP.

"**cGCP**" means current good clinical practices as required by the rules, guidelines and regulations of the Regulatory Authorities, as applicable for clinical research and clinical trials.

"**cGLP**" means current good laboratory practices as required by the rules, guidelines and regulations of the Regulatory Authorities, as applicable for nonclinical laboratory studies that

support or are intended to support applications to conduct research in humans or to obtain marketing authorization.

"**cGMP**" means current good manufacturing practices as required by the rules, guidelines and regulations of the Regulatory Authorities, as applicable to the manufacture, packaging, handling, storage and control of the API in the Territory.

"**Code**" has the meaning set forth in Section 13.5.

"**Co-Developed Intellectual Property**" means all Intellectual Property that is (i) after the Effective Date conceived, developed, created or reduced to practice by either of the Parties in conjunction with the other Party, and (ii) related to the API or a Product or useful or necessary for the manufacture, use, sale, offer for sale or import of the API or a Product in the Territory.

"**Commercial Launch**" means the first commercial sale in the Territory of a Product by Endo, or an Affiliate or by a sub-licensee of Endo, as the case may be, to a Third Party.

"**Commercially Reasonable Efforts**" means with respect to each Party, commercial efforts, commitment of resources and diligence consistent with professional business standards generally practiced in the pharmaceutical industry, applied in accordance with such Party's reasonable business, legal, medical, and scientific judgment, including the efforts and resources that such Party uses for other products owned by it or to which it has rights, that are of similar market potential and at a similar stage in their life cycle, taking into account the competitiveness of the marketplace, the regulatory structure involved, the profitability of the applicable products and other relevant factors, including technical, legal, scientific, medical, sales performance, and/or marketing factors.

"**Competing Product**" means any pharmaceutical product containing the API (other than a Product).

"**Compliance Event**" has the meaning set forth in Section 11.3.4.

"**Confidential Information**" means information of a Party that is disclosed to or obtained by the other Party (including information obtained by a Party as a result of access to the facilities of the other Party) either prior to or during the term of this Agreement, which information (a) is non-public, confidential or proprietary in nature, including trade secrets, financial data, product information, manufacturing methods, market research data, marketing plans, identity of customers, nature and source of raw materials, product formulation and methods of producing, testing and packaging, or (b) relates to the disclosing Party's past, present or future research, development or commercialization activities, in each case including a Party's proprietary information; provided, however, that Confidential Information shall not include information that a Party can demonstrate by written and competent evidence: (i) is in the public domain other than as a result of a wrongful act, fault or negligence of such Party (or any of its Affiliates) with respect to its obligations of confidentiality contained herein; (ii) was known by the receiving Party prior to receipt from the disclosing Party; (iii) has been developed by the receiving Party independent of any Confidential Information of the other Party; or (iv) was subsequently, lawfully and in good faith obtained by the receiving Party on a non-confidential basis from a Third Party that was not under an obligation to treat such information in a confidential manner and had a lawful right to make such disclosure.

Without limiting the foregoing, the terms of this Agreement shall constitute "Confidential Information" of each Party hereunder.

"**Control**" means, with respect to any Intellectual Property, possession by a Party of the ability (whether by ownership, license or otherwise) to grant access, rights, title, possession, a license or a sublicense to such Intellectual Property without violating the terms of any Third Party agreement, court order, or other arrangement or legal obligation.

"**Cure Period**" has the meaning set forth in Section 13.2.1.

"**Customer Late Delivery Claim**" has the meaning set forth in Section 5.5.3.

"**Data Protection Laws**" means all applicable data privacy, data protection, information security and other related laws, rules, regulations that are applicable to Protected Personal Information, including without implied limitation the General Data Protection Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data, and repealing Directive 95/46/EC.

"**Development Plan**" means the development plan to be agreed by the Parties in writing within thirty (30) days of the Effective Date, which sets forth certain development obligations of the Parties.

"**DMF**" means, within the United States, a submission of information about an active pharmaceutical ingredient to the FDA pursuant to 21 C.F.R. § 314.420 that permits the party submitting such information to authorize others to rely on such information in support of a submission, such as a NDA or ANDA, to the FDA, and, with respect to any jurisdiction of the Territory outside of the United States, an equivalent regulatory filing regarding an active pharmaceutical ingredient in such jurisdiction.

"**Dollar**" or "**$**" means the United States dollar.

"**Effective Date**" has the meaning given to such term in the first paragraph of this Agreement.

"**Endo**" has the meaning given to such term in the first paragraph of this Agreement.

"**Endo Designated Laboratory Facility**" means Endo's designated internal or Third Party laboratory as designated by Endo in writing.

"**Endo Designated Manufacturing Facility**" means Endo's designated internal or Third Party manufacturer's facility as designated by Endo in writing.

"**Endo Intellectual Property**" means all Intellectual Property that is (i) owned or Controlled by Endo or any of its Affiliates as of the Effective Date or thereafter, and (ii) related to the API or a Product or useful or necessary for the manufacture, use, sale, offer for sale or import of the API or a Product in the Territory.

"**Endo ROFN Notice**" has the meaning set forth in Section 2.3.1.

"**Export Control Laws**" means all applicable U.S. laws and regulations relating to (a) economic and trade sanctions and embargoes imposed by the Office of Foreign Assets Control of the U.S. Department of Treasury or (b) the export or re-export of commodities, technologies, or services, including the Export Administration Act of 1979, 24 U.S.C. §§ 2401-2420, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706, the International Traffic in Arms Regulations, 22 C.F.R. parts 120-130, the Trading with the Enemy Act, 50 U.S.C. §§ 1 et. seq., the Arms Export Control Act, 22 U.S.C. §§ 2778 and 2779, and the International Boycott Provisions of Section 999 of the U.S. Internal Revenue Code of 1986 (as amended).

"**Facility**" means Apicore's facility located at Block No. 252-253, NH228, Dhobikuwa, Gujarat 391440, India, or such other facility where the API is manufactured.

"**FDA**" means the United States Food and Drug Administration and any successor agency thereto.

"**Forecast**" has the meaning set forth in Section 5.2.1.

"**Force Majeure Event**" has the meaning set forth in Section 15.11.

"**Government Official**" means any (a) officer, employee of a government or any department, agency or instrument of a government; (b) person acting in an official capacity for or on behalf of a government or any department, agency, or instrument of a government; (c) officer or employee of a company or business owned in whole or part by a government; (d) officer or employee of a public international organization such as the World Bank or United Nations; (e) officer or employee of a political party or any person acting in an official capacity on behalf of a political party; and/or (f) candidate or relative of any candidate for political office.

"**Governmental Authority**" means any court, tribunal, arbitrator, agency, legislative body, commission, official or other instrumentality of (i) any government of any country, or (ii) a federal, state, province, county, city or other political subdivision thereof.

"**Healthcare Professional**" means any member of the medical, pharmacy or nursing professions or any other person who in the ordinary course of his or her professional activities may prescribe, purchase, supply or administer a medicinal product.

"**Initial Term**" has the meaning set forth in Section 13.1.

"**Intellectual Property**" means all of the following, to the extent applicable: (i) patent applications and patents corresponding to any of the foregoing that may grant or may have been granted on any applications, including reissues, re-examinations, divisions, continuations, continuations-in-part, and extensions and any supplemental protection certificates, and equivalents thereof; (ii) all know-how, work product, trade secrets, inventions (whether patentable or otherwise), data, processes, techniques, procedures, compositions, devices, methods, formulas, protocols and information, whether patentable or not; (iii) copyrightable works, copyrights and applications, registrations and renewals; (iv) logos, trademarks, service marks, and all applications and registrations relating thereto; (v) other proprietary rights, whether arising under the laws of the

United States or any other state, country or jurisdiction, including all rights or causes of action for infringement or misappropriation of any of the foregoing; and (vi) copies and tangible embodiments of any one or more of the foregoing.

"**Liabilities**" has the meaning set forth in Section 12.1.

"**Milestone Payments**" has the meaning set forth in Section 6.1.

"**Minimum Lead Time**" has the meaning set forth in Section 5.1.2.

"**Minimum Purchase Amount**" has the meaning set forth in Section 3.3.

"**NDA**" means a new drug application under Section 505(b) of the Act, 21 U.S.C. § 355(b)(1).

**"Objection Notice**" has the meaning set forth in Section 5.4.2.

"**Party**" means Endo, on the one hand, or the RK Parties, on the other hand and "**Parties**" shall mean Endo and the RK Parties.

"**Person**" means an individual, corporation, partnership, limited liability company, firm, association, joint venture, estate, trust, governmental or administrative body or agency, or any other entity.

"**Physical Inspection**" means a visual inspection of the outer packaging of a shipment of API delivered as set forth in Section 5.4.1.

"**Product**" means a finished form pharmaceutical product which contains the API (which for the avoidance of doubt has the molecular weight distribution of the active pharmaceutical ingredient in the Reference Listed Drug).

"**Product Regulatory Filing**" means an ANDA, NDA or other regulatory filing filed by Endo or any of its Affiliates for a Product to seek Regulatory Approval by a Regulatory Authority, as such filing may be supplemented and/or amended from time to time.

"**Protected Personal Information**" means information relating to an identified or identifiable natural person that is (i) provided by one Party to the other Party in connection with this Agreement and (ii) protected under Data Protection Laws.

"**Purchase Order**" has the meaning set forth in Section 5.1.1.

"**Purchase Order Confirmation**" has the meaning set forth in Section 5.1.3.

"**Raw Materials**" means any starting material used in the synthesis and/or production of the API.

"**Reference Listed Drug**" means ELMIRON®, 100mg capsules, NDA #020193, owned by Janssen Pharmaceuticals, or any product marketed pursuant to any supplement or amendment of NDA #020193.

"**Regulatory Approval**" means the applicable approvals necessary to make a Product or the API (as applicable), including approval of a Product Regulatory Filing, receipt of a completeness assessment for the Apicore DMF, and all applicable product and/or establishment licenses, registrations, permits or other authorizations as may be necessary in connection with a Product or the API (as applicable), and which are necessary for the commercial manufacture, commercialization, use, storage, importation, transport, promotion, pricing, distribution or sale of a Product or the API (as applicable) in the Territory.

"**Regulatory Authorities**" means the Governmental Authorities in the Territory with authority over the manufacture or distribution of a pharmaceutical product in the Territory (including the grant of Regulatory Approvals), including, with respect to the United States, the FDA.

"**Rejection Notice**" has the meaning set forth in Section 5.4.1.

"**Renewal Term**" has the meaning set forth in Section 13.1.

"**Representatives**" has the meaning set forth in Section 10.1.

"**RK Parties**" has the meaning given to such term in the first paragraph of this Agreement.

"**RK Pharma**" has the meaning given to such term in the first paragraph of this Agreement.

"**RK Parties Intellectual Property**" means all Intellectual Property that is (i) owned or Controlled by one of the RK Parties or any of their Affiliates as of the Effective Date or thereafter, and (ii) related to the API or useful or necessary for the manufacture, use, sale, offer for sale or import of the API in the Territory.

"**RK ROFN Notice**" has the meaning set forth in Section 2.3.3.

"**ROFN Negotiations**" has the meaning set forth in Section 2.3.2.

"**Specifications**" means, collectively, the written manufacturing and standard testing procedures, processes, practices, standards, instructions and specifications for the API, including all applicable quality control procedures and analytical test methods contained therein, as mutually agreed by the Parties in accordance with the Development Plan, and as such may be amended, supplemented or otherwise modified from time to time by mutual agreement of both Parties or as otherwise set forth herein.

"**Steering Committee**" shall mean a committee consisting of representatives of the RK Parties and Endo to coordinate and facilitate the communication and decision making regarding the development and regulatory strategies of the API as further set out in Section 2.2.

"**Supply Price**" has the meaning set forth in Section 6.3.1.

"**Tax**" or "**Taxes**" shall mean all taxes, including income, corporation, gross receipts, transfer, excise, property, sales, harmonized sales, use, value-added, license, payroll, withholding, social insurance, employment insurance, employer health, franchise or other governmental taxes,

imposed by any Taxing Authority (including any interest, penalties or additional tax attributable thereto).

"**Taxing Authority**" shall mean any Governmental Authority, exercising any authority to impose, regulate or administer the imposition of Taxes.

"**Term**" has the meaning set forth in Section 13.1.

"**Territory**" means the United States of America, and its commonwealths, territories, districts and possessions, including the District of Columbia, Commonwealth of Puerto Rico; and any installation, territory, location or jurisdiction under the purview of the FDA or control of the United States government; and any United States military bases and installations worldwide.

"**Third Party**" or "**Third Parties**" means any Person other than a Party or its Affiliates.

"**Validation Batches**" has the meaning set forth in Section 13.2.7.

## ARTICLE 2.
## API DEVELOPMENT

**2.1 RK Parties' General Obligations**.

2.1.1 Subject to the obligations of Endo and the Steering Committee under this Agreement (including the Development Plan), the RK Parties shall be solely responsible for and have decision-making authority with respect to the development of the API; provided, that the RK Parties shall permit Endo's involvement in such development, and shall consider Endo's substantive input in the development of the API.

2.1.2 Subject to the obligations of Endo and the Steering Committee under this Agreement (including the Development Plan), the RK Parties shall be responsible to develop the API and carry out stability studies in accordance with the Development Plan, the Specifications and decisions of the Steering Committee, strictly observing Applicable Laws, including cGCP, cGLP and cGMP. The RK Parties shall use Commercially Reasonable Efforts to perform its responsibilities as and within the time frames set forth in the Development Plan.

2.1.3 The RK Parties shall be responsible for manufacturing the API in accordance with the Specifications; the scale-up of production, methods and facilities for the supply of commercial amounts of the API; the analytical testing of the API as required by the Specifications; the characterization of any impurities; the validation of API as required by the Regulatory Authorities; stability testing of the API; and all other testing or studies required to support the qualification of the API. The RK Parties shall be responsible, at their cost, for remedying any deficiencies identified by a Regulatory Authority in the API, the Apicore DMF or any Product (to the extent related to the API). Without limiting Endo's other remedies, in the event Endo reasonably determines that the RK Parties are unable to timely resolve any deficiency, Endo and its Affiliates shall be released from the purchase requirements of Section 3.2.2 or may terminate this Agreement pursuant to Section 13.2.7.

2.1.4 Without limiting the generality of the foregoing:

(i) The RK Parties shall conduct the sameness studies related to the API as described on Schedule 2.1.4 and shall thereafter share their full report with Endo. The sameness studies shall be carried out in labs agreed to and approved by Endo in writing (which shall be FDA approved labs as applicable and as reasonably available). The RK Parties shall provide Endo with a reasonably detailed, written weekly report on the progress of the sameness studies and the Parties shall agree on a prioritization plan for the studies to ensure the studies are completed within fourteen (14) weeks of the completion of the Validation Batches. The RK Parties shall take all actions to ensure the studies pass Endo's regulatory review once the RK Parties' full report is compiled and shared with Endo. All costs and expenses associated with the conduct of the sameness studies shall be borne by the RK Parties.

(ii) After performing the sameness studies, the RK Parties shall transfer the methods to the Endo Designated Laboratory Facility. Thereafter Endo will perform, or caused to be performed, the same characterizations on Endo's release of API against the reference listed drug. If the methods are not reproducible by Endo, the RK Parties shall reasonably assist and cooperate with Endo to resolve. If there is a defect in the RK Parties' developed methods that causes the methods to be non-transferrable to Endo (notwithstanding Endo's reasonable efforts) then the RK Parties shall bear the direct third party costs incurred by Endo and its Affiliates on an actual basis.

(iii) In the event a sameness study for parenteral grade API is required by Endo or a Regulatory Authority, the RK Parties shall perform such studies for no additional cost. If a parenteral grade API requires additional processing in a separate area of the Facility as compared to oral grade API, then Endo shall issue a new Purchase Order for Validation Batches of parenteral grade API.

2.1.5 The RK Parties shall be solely responsible for and maintain materials, facilities and personnel reasonably necessary and of appropriate skill to fulfill its obligations under this Agreement.

2.1.6 The RK Parties shall conduct release testing (or with the prior written consent of Endo, have such release testing conducted on its behalf by a Third Party) to be submitted to Endo. Such release testing shall be performed in accordance with cGMP and at the Regulatory Authority-approved facility.

2.1.7 The RK Parties shall be responsible, at their sole cost and expense, for making all payments to the FDA or any Regulatory Authority required under all Applicable Laws in order to perform their obligations hereunder, except as otherwise provided herein.

**2.2 Steering Committee**.

2.2.1 Within thirty (30) days after the Effective Date, the RK Parties and Endo shall form a Steering Committee which shall be responsible for organizational objectives, resolution of conflicts and decision making. The Steering Committee shall be composed of three (3) representatives of each Party, with one (1) representative of each Party having the authority required to make decisions of the Steering Committee on behalf of his or her Party (the "**Authorized Person**").

2.2.2 The Steering Committee shall be responsible for:

(i) the decision making regarding the development, procurement and regulatory strategies of the API and in cases where no agreement could be reached on the team level;

(ii) reviewing and discussing the Parties' development progress and manufacturing activities related to the API, including the performance and timeliness of the activities under the Development Plan;

(iii) reviewing and approving changes to the Development Plan on an as-needed basis;

(iv) amicably resolving any disputes between the Parties;

(v) the discussion of the RK Parties' strategy in lawsuits or other litigation relating to Intellectual Property involving the API;

(vi) the discussion of Endo's strategy in lawsuits or other litigation relating to Products;

(vii) the decision making in any other lawsuits or other litigation in connection with the Agreement, including but not limited to quality issues with the API; and

(viii) performing such further tasks and responsibilities that the Parties agree in writing to entrust to the Steering Committee.

2.2.3 The Steering Committee shall meet in person or by telephone or video conference at a frequency to be determined by the members of the Steering Committee; however, a first meeting shall take place within sixty (60) days after the Effective Date. Meetings in person shall alternate between RK Pharma's and Endo's offices. The Steering Committee may, at its sole discretion, invite additional representatives of the Parties to attend meetings of the Steering Committee in an observer role or as a contributor when

appropriate. Each Party shall bear its own costs in relation to meetings of the Steering Committee.

2.2.4 The chair of the Steering Committee shall alternate each year between a representative from the RK Parties and Endo. The agenda for a meeting shall be drafted by the chairperson and shall be distributed no later than fifteen (15) days prior to the meeting.

2.2.5 All decisions of the Steering Committee shall be made by unanimous vote of the Authorized Persons. In order to achieve a quorum for any meeting of the Steering Committee, both Authorized Persons shall be in attendance at such meeting.

2.2.6 Within fifteen (15) days after each meeting, the chairperson shall send draft minutes of the meeting to the other Party. Such minutes shall in particular document all decisions taken in the meeting. Each Party shall provide comments, if any, to such draft minutes as soon as practicable, at the latest until the next meeting in which all Parties shall discuss any such comments and come to an agreement on the minutes. The agreed minutes shall be signed by the chairperson and sent to the other Party for countersignature.

2.2.7 Decisions of the Steering Committee properly made and documented in accordance with this Section 2.2 shall be binding on both Parties.

**2.3 Right of First Negotiation**.

2.3.1 Endo shall have the option, upon written notice to the RK Parties, to propose amending this Agreement to (i) include additional jurisdictions in the Territory ("Additional Territories"), and/or (ii) expand the scope of Pentosan active pharmaceutical ingredients (including a low molecular weight version, "Additional APIs") exclusively supplied to Endo (an "Endo ROFN Notice").

2.3.2 Following delivery of an Endo ROFN Notice, the Parties shall negotiate in good faith the substantive terms of Endo's proposal for not less than sixty (60) days (or such longer time as agreed by the Parties) ("ROFN Negotiations"). The ROFN Negotiations shall include the applicable supply price to be paid by Endo for any Additional APIs.

2.3.3 In the event either RK Party desires to, or is solicited by any Third Party to, undertake any development and/or commercialization efforts in respect of the API in Additional Territories, or any Additional APIs anywhere in the world, and to date Endo has not delivered an Endo ROFN Notice on such matter, the RK Parties shall first provide Endo with a written proposal of the substantive terms that would govern such development and/or commercialization efforts (an "RK ROFN Notice"). Following delivery of an RK ROFN Notice, the Parties shall begin ROFN Negotiations on the RK Parties' proposal.

2.3.4 If the Parties reach an agreement during the ROFN Negotiations (whether stemming from an Endo ROFN Notice or an RK ROFN Notice), then the Parties shall, for an additional period of thirty (30) days, negotiate in good faith a definitive written amendment to this Agreement in respect thereof.

2.3.5 If the Parties fail to reach an agreement following the ROFN Negotiations (whether stemming from an Endo ROFN Notice or an RK ROFN Notice), the RK Parties may thereafter offer to collaborate with a Third Party with respect to the Additional Territory and/or Additional APIs which were included in the ROFN Negotiations, provided that the substantive terms thereof (including the financial aspects) are not more favorable to such Third Party as compared to the substantive terms last proposed to Endo in the ROFN Negotiations.

## ARTICLE 3.
## EXCLUSIVITY

**3.1 Co-Development**. The RK Parties and Endo and their respective Affiliates shall exclusively cooperate in the development and commercialization of the API within the Territory.

**3.2 Exclusivity**.

3.2.1 Unless otherwise agreed between the Parties in this Agreement and subject to Section 3.3, neither of the RK Parties, nor any of their Affiliates:

(i) shall grant any rights to or out-license to any Third Parties any Intellectual Property for the development, manufacturing or commercialization of the API for use in any Competing Product in the Territory, including, without limitation, granting rights to make, use or sell the API for use in any Competing Product in the Territory; and

(ii) shall, directly or indirectly, develop, manufacture, market, sell or otherwise commercialize the API for use in any Competing Product in the Territory.

3.2.2 Unless otherwise agreed between the Parties in this Agreement, Endo and its Affiliates shall purchase at least eighty percent (80%) of their annual requirements of the API in the Territory. For the avoidance of doubt, Endo shall be entitled to qualify a second supplier of the API and purchase up to twenty percent (20%) of its and its Affiliates' annual requirements of the API from such supplier.

**3.3 Minimum Purchase Amount.** The exclusivity obligations under Section 3.2.1 shall apply solely during the Term and solely to the extent that Endo purchases from the RK Parties or their Affiliates at least 100 kg of API (the "**Minimum Purchase Amount**") per calendar year during the Term beginning with the year of Commercial Launch. In the event that Endo does not purchase at least the Minimum Purchase Amount in any calendar year following Commercial Launch, and there has not been any deficiencies identified by a Regulatory Authority in the API, the Apicore DMF or any Product, then thereafter the Parties' obligations in Section 3.2 shall be of no further force or effect and, at their option, the RK Parties may terminate this Agreement upon written notice to Endo.

## ARTICLE 4.
## REGULATORY OBLIGATIONS

**4.1 DMF**. Apicore shall file the Apicore DMF with the Regulatory Authorities in the Territory in accordance with the Development Plan, and thereafter will update the Apicore DMF upon Endo's request. The Apicore DMF shall not be revised by either RK Party without Endo's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. RK Pharma shall notify Endo in writing within three (3) Business Days of its or Apicore's receipt of any Regulatory Authority correspondence relating to the Apicore DMF (and provide Endo with a copy of such correspondence and its response to the Regulatory Authority). The RK Parties shall take all reasonable actions (including all applicable stability programs) to maintain and preserve the Apicore DMF. **Specification Changes**. From time to time, Endo may make written requests to RK Pharma to modify the Specifications based on technical, formulation development, regulatory or commercial considerations. RK Pharma shall cooperate with Endo and modify the Specifications as necessary to implement such requests. Notwithstanding anything herein to the contrary, in the event any Regulatory Authority requires the Specifications to be modified for any reason in order to obtain or maintain Regulatory Approval for a Product, upon written notice provided by Endo to RK Pharma, the Specifications shall be modified accordingly. The RK Parties shall be responsible for all costs and expenses for any modifications to the Specifications, including any modifications to the Apicore DMF.

**4.3 Product Regulatory Filings**. Endo or its Affiliate(s) shall be responsible for all communications with the Regulatory Authorities relating to all of its Product Regulatory Filings and any Regulatory Authority submissions or communications related thereto. In addition, Endo or its Affiliate(s) shall have sole control of and responsibility for preparing any patent certifications and related notice letters in connection with all of its Product Regulatory Filings and the prosecution and/or defense of any citizen's petition associated with all of its Product Regulatory Filings.

**4.4 Regulatory Authority Communications**. Upon Endo's request, the RK Parties shall cooperate in good faith in all communications to the Regulatory Authorities with respect to prosecution of the Product Regulatory Filings, including, but not limited to, making any changes or amendments to facilitate Regulatory Approval of a Product Regulatory Filing, and responding to any Regulatory Authority request relating to a Product, API, or facilities used in, or proposed for use in, the manufacture of a Product or the API.

## ARTICLE 5.
## FORECASTS, ORDERS, DELIVERY AND ACCEPTANCE

**5.1 General**.

5.1.1 Except as otherwise expressly provided for in this Agreement, Endo's purchases of API shall be made pursuant to firm purchase orders in writing that will specify the amount of the API ordered, the delivery dates for such orders, and the delivery locations (each, a "**Purchase Order**").

5.1.2 The delivery date or dates of each Purchase Order may be specified in Endo's discretion, provided that the earliest date in any given Purchase Order shall not be less than the "**Minimum Lead Time**" (as set forth on Schedule 5.1.2) following the date of the Purchase Order. Each Purchase Order shall be for whole batch sizes of API. The Parties shall mutually agree on the batch size.

5.1.3 Within five (5) Business Days of receipt of any Purchase Order, the RK Parties shall acknowledge receipt of such Purchase Order. The RK Parties shall be obligated, within five (5) Business Days of receipt of the Purchase Order, to confirm any Purchase Order which complies with the Minimum Lead Time and for which the requested order quantities do not exceed the Forecast by more than thirty percent (30%) (such confirmation, a "**Purchase Order Confirmation**"). The RK Parties shall not be obligated to confirm a Purchase Order that requires the RK Parties to supply more than one hundred and thirty percent (130%) of the quantity of Product set forth in the applicable Forecast, together with all other Purchase Orders then outstanding. If the RK Parties fail to confirm the Purchase Order, including the Product quantities and delivery date(s) therein, within such five (5) Business Day period, then a Purchase Order Confirmation shall be automatically deemed to be given.

5.1.4 Endo may cancel or modify a Purchase Order for the reduction any quantities of API under such Purchase Order after Commercial Launch by submitting a written change order to the RK Parties no less than thirty (30) days prior to the expected delivery date; provided, that Endo shall reimburse the RK Parties for its reasonable and documented costs and expenses incurred in performance of the cancelled Purchase Order up to the date of cancellation; provided further, that the RK Parties shall use Commercially Reasonable Efforts to mitigate such costs and expenses including by reallocating resources and materials to other products.

5.1.5 Any terms and conditions of an invoice, Purchase Order, acknowledgement or similar document provided by Endo or the RK Parties to the other Party for the API that are inconsistent with the terms of this Agreement shall be null and void.

**5.2 Forecasts.**

5.2.1 No later than one hundred and eighty (180) days prior to the scheduled or anticipated Commercial Launch, Endo shall provide RK Pharma with a good-faith, non-binding forecast of estimated quantities of the API for such Commercial Launch ("<u>Forecast</u>"). From time to time during such one hundred eighty (180) day period, Endo may provide revised, non-binding Forecasts of estimated quantities of the API for such Commercial Launch.

5.2.2 By the fifth (5th) business day of each Calendar Quarter (beginning with the first full Calendar Quarter after the first Commercial Launch), Endo shall provide RK Pharma with a good-faith, non-binding, rolling twelve (12) month Forecast (or a Forecast for the remainder of the Term, whichever is shorter) of Endo's anticipated orders of API.

**5.3 Shipment and Delivery.** Delivery of the API shall be CIP (Incoterms 2020) for

delivery in India to the Endo Designated Manufacturing Facility or Endo Designated Laboratory Facility or EXW (Incoterms 2020) the Facility for delivery outside India, as requested in writing by Endo in the Purchase Order.

**5.4 Acceptance and Rejection of the API**.

5.4.1 Endo may reject any shipment of API as defective if the API does not conform to the Specifications or if it fails to conform with any warranty set forth in this Agreement. Endo shall deliver written notice of any such rejection (a "**Rejection Notice**") to RK Pharma within (i) sixty (60) days after actual receipt of the API at the Endo Designated Manufacturing Facility or Endo Designated Laboratory Facility (as applicable), in the case of defects that are readily discoverable upon a Physical Inspection of a API shipment or (ii) thirty (30) days after the date of Endo's discovery of any defect that was not obvious and could not be readily discovered through a Physical Inspection. The foregoing shall not relieve the RK Parties from their indemnification obligations under Section 12.1. Any Rejection Notice shall state in reasonable detail the reason why Endo believes such API is defective. Endo shall, upon the request of RK Pharma, provide a sample of the API being rejected and copies of written reports relating to tests, studies or investigations performed to date by or on behalf of Endo on the API being rejected.

5.4.2 RK Pharma shall notify Endo in writing, within thirty (30) days of receipt by RK Pharma of the Rejection Notice whether RK Pharma agrees or disagrees with such Rejection Notice. RK Pharma's notice of disagreement therewith shall be deemed an "**Objection Notice**". If Endo and RK Pharma fail within ten (10) Business Days after delivery of the Objection Notice to agree as to whether the API identified in the Rejection Notice is defective, representative samples of the batch of API in question shall be submitted to a mutually acceptable qualified and reputable independent laboratory or consultant for analysis or review. The results of such evaluation shall be binding upon the Parties. The Party that is determined to have been incorrect in its determination of whether the API should be rejected shall assume the responsibility for, and pay, the costs of any such evaluation and promptly reimburse the other Party for any amounts paid by such other Party to the independent laboratory or consultant in connection with that determination.

5.4.3 If any shipment of API is rejected by Endo as per this Section 5.4, Endo's duty to pay any and all amounts payable to RK Pharma in respect of the rejected API shall be suspended until (i) if the RK Parties do not deliver an Objection Notice or if the independent laboratory or consultant makes a determination in support of the Rejection Notice in accordance with Section 5.4.2, the RK Parties' delivery of a replacement shipment of the rejected portion of the API shipment, at the RK Parties' cost, or (ii) a determination by the independent laboratory or consultant in support of the Objection Notice in accordance with Section 5.4.2. If only a portion of a shipment is rejected, Endo's duty to pay shall be suspended only as to the defective portion.

5.4.4 If a shipment or partial shipment is rejected by Endo pursuant to the provisions of this Section 5.4, and if RK Pharma either agrees with the rejection or if such shipment or partial shipment is found to be defective by an independent laboratory or consultant, Endo shall, at RK Pharma's request and expense, return to RK Pharma, or

destroy and provide evidence of such destruction to RK Pharma of any such available rejected API. Endo shall have no obligation to pay either of the RK Parties for such rejected API and to the extent Endo has already paid, the RK Parties shall, at Endo's election, within ninety (90) days from the rejection date, either provide replacement API or credit or reimburse the amount of the original invoice in respect of the rejected API. In the event such rejection is agreed to by RK Pharma or confirmed by an independent laboratory or consultant, and Endo elects to have the API replaced, Endo shall be obligated to pay only for the replacement shipment of API supplied by the RK Parties.

5.4.5 If a shipment or partial shipment is rejected by Endo pursuant to the provisions of this Section 5.4, and if Endo and RK Pharma agree within ten (10) Business Days after delivery of the Objection Notice that such shipment or partial shipment is not defective or if such shipment or partial shipment is found to be without defect by an independent laboratory or consultant, Endo shall accept, and pay for, such shipment and any replacement shipments, if applicable.

5.4.6 During the pendency of any rejection discussions, upon Endo's request, the RK Parties shall use Commercially Reasonable Efforts to supply Endo with additional API that Endo shall purchase on the same terms as the API that is the subject of the rejection discussions.

**5.5 Supply Interruption; Customer Penalties; Supply Price Reduction**.

5.5.1 Upon becoming aware of any facts or circumstances that either RK Party reasonably expects to affect its ability to supply the quantity of API, which the RK Parties are required to supply hereunder, by the applicable requested delivery date, RK Pharma shall notify Endo in writing as promptly as possible thereafter (i) of such inability to timely supply the API, (ii) the underlying reasons for such inability and (iii) the indicative date when the RK Parties are expected to again be able to supply the API in accordance with the terms hereof. The RK Parties shall use Commercially Reasonable Efforts to remedy any shortfall of API as soon as reasonably practicable. Following Endo's receipt of RK Pharma's notice of such inability to timely supply API hereunder, Endo may, upon five (5) days' prior written notice to RK Pharma, inspect the Facility pursuant to Section 8.2 of this Agreement and the RK Parties shall allow Endo to assist with, and consider in good faith all suggestions from Endo regarding, any remediation efforts.

5.5.2 In the event that (i) deliveries of the API ordered by Endo under this Agreement are late in the aggregate by more than ninety (90) days from the date(s) committed by the RK Parties in a Purchase Order Confirmation in any one hundred eighty (180) day period, or (ii) delivery of the API ordered by Endo pursuant to a Purchase Order under this Agreement is late by more than ninety (90) days from the date committed by the RK Parties in a Purchase Order Confirmation, or (iii) API is properly rejected under Section 5.4 and not replaced within ninety (90) days after delivery of the Rejection Notice by Endo if an Objection Notice is not delivered by the RK Parties or, if an Objection Notice is delivered by the RK Parties, within ninety (90) days after a laboratory analysis pursuant to Section 5.4.2 in Endo's favor, Endo shall have the right, at its sole option, (a) to withdraw

any Purchase Orders previously submitted hereunder, and/or (b) to terminate this Agreement upon written notice to the RK Parties.

5.5.3 If, as a result of a delay in delivery of API, Endo is subject to any failure-to-supply penalties (notwithstanding Endo having reasonable quantities of three (3) months' supply as safety stock) from any Third Party customer purchasing a Product pursuant to contractual terms with such customer (a "**Customer Late Delivery Claim**"), then the RK Parties shall indemnify and hold Endo, its Affiliates and their respective officers, directors, employees, agents or representatives harmless from and against any Liabilities (as defined below) suffered or incurred as a result of the Customer Late Delivery Claim to the extent such penalties are the result of the RK Parties' failure to supply API as required under this Agreement; provided, that Endo shall use Commercially Reasonable Efforts to mitigate such Liabilities; provided, further, that the RK Parties shall be excused from such Customer Late Delivery Claim and shall have no obligation to indemnify Endo therefor to the extent resulting from a Force Majeure Event; provided, further, that Endo may not settle any Customer Late Delivery Claim without the prior written consent of the RK Parties, not to be unreasonably withheld or delayed. Notwithstanding anything to the contrary herein, in no event will the RK Parties be liable for any incidental, consequential, indirect, statutory, special, exemplary or punitive damages, including, but not limited to, lost profits, loss of use, loss of time, inconvenience, lost business opportunities, damage to goodwill or reputation, or other economic loss, regardless of whether such liability is based on breach of contract, tort, strict liability or otherwise, and even if the RK Parties were advised of the possibility of such damages or such damages could have been reasonably foreseen.

5.5.4 In the event the RK Parties fail to deliver any shipment of API by the delivery date specified by Endo in a Purchase Order confirmed by the RK Parties in a Purchase Order Confirmation, the Supply Price shall be reduced as set forth in Schedule 5.5.4 (attached hereto).

**5.6 Raw Materials**.

5.6.1 Prior to delivery of the Validation Batches, the RK Parties shall negotiate and enter into a supply agreement with the supplier of the Raw Material, which supplier shall be reasonably acceptable to Endo, such acceptance not to be unreasonably withheld, conditioned or delayed. The RK Parties shall keep Endo reasonably informed of the negotiations and provide a copy of the final agreement once executed. The RK Parties shall not switch suppliers of the Raw Material during the development of the API or thereafter without Endo's prior written consent, not to be unreasonably withheld, conditioned or delayed.

5.6.2 At all times during the Term of this Agreement, the RK Parties shall, at their sole cost and expense, maintain at least three (3) months' safety stock of the Raw Materials in quantities sufficient to manufacture API in accordance with Endo's most recently submitted Forecast.

## ARTICLE 6.
## FINANCIAL PROVISIONS

**6.1 Milestones**. Subject to the RK Parties timely meeting the applicable milestones set forth below, Endo shall pay to RK Pharma up to Two Million Dollars ($2,000,000) ("**Milestone Payments**") as follows:

6.1.1 One Million Five Hundred Thousand Dollars ($1,500,000) upon the execution and delivery of this Agreement by all Parties;

6.1.2 Five Hundred Thousand Dollars ($500,000) upon the filing of the Apicore DMF and the API appearing on the FDA's DMF Available for Reference List.

**6.2 Payment of Milestones**. RK Pharma shall invoice Endo for each Milestone Payment upon achievement of the applicable milestone, and Endo shall pay each Milestone Payment within sixty (60) days of its receipt of the applicable invoice, except for the invoice arising from Section 6.1.1 which Endo shall expedite and pay as soon as is reasonably practicable. The Milestone Payments shall be subject to a refund if this Agreement is terminated pursuant to Section 13.2.7, otherwise such payments are non-cancellable and non-refundable.

**6.3 Supply Price**.

6.3.1 Endo shall pay to RK Pharma for supply of the API an amount equal to the Supply Price. RK Pharma shall invoice Endo for the Supply Price no earlier than the date the API is dispatched. For the purposes of this Agreement, the "**Supply Price**" means the total unit price to be paid by Endo to RK Pharma for the supply of the API as follows, which shall be subject to adjustment pursuant to this Section 6:

(i) $7,000 per kg of oral grade API; and

(ii) $7,500 per kg of injectable grade API.

6.3.2 Endo shall pay RK Pharma the Supply Price for amounts of API delivered by the RK Parties to Endo in accordance with Section 5.4 within sixty (60) days from the date of Endo's receipt of invoice.

6.3.3 No later than ninety (90) days prior to the last day of each calendar year during the Term:

(i) RK Pharma may provide Endo with a written notice of any increases in Raw Material costs for the manufacture or production of the API, along with reasonable supporting documentation. Endo and RK Pharma shall then negotiate in good faith for no less than thirty (30) days, and if Endo agrees, the Supply Price for future Purchase Orders will be proportionally increased to reflect such increased cost; provided that, in no event shall the Supply Price increase by more than three percent (3%) year over year; and

(ii) Endo may provide RK Pharma with a written notice of changes in market conditions which necessitate a decrease in the Supply Price. Endo and RK Pharma shall then negotiate in good faith for no less than thirty (30) days, and if RK Pharma agrees, the Supply Price for future Purchase Orders will be proportionally decreased to reflect such changed market conditions.

6.3.4 The RK Parties shall use Commercially Reasonable Efforts to mitigate both the frequency and Dollar amount of any Raw Material costs increases with its Third Party suppliers.

6.3.5 In the event that Endo receives a bona fide offer from a Third Party to sell the API to Endo for a price that is lower than the Supply Price, Endo may provide written notice thereof to RK Pharma, and the RK Parties shall have the right to match the other offer within ten (10) Business Days. If the RK Parties do not elect not to match such offer, Endo and its Affiliates shall be released from the purchase requirements of Section 3.2.2 solely with respect to oral grade API and the RK Parties may terminate this Agreement solely with respect to oral grade API upon written notice to Endo.

**6.4 Costs and Expenses**. Except as expressly provided in this Agreement, each Party shall bear its own costs and expenses incurred in the performance of its obligations hereunder without charge or expense to the other.

**6.5 Taxes**. The Supply Price is exclusive of Taxes. All Taxes assessed or charged on the purchase by Endo of the API sold pursuant to this Agreement (excluding any Taxes based on the RK Parties' income) shall be paid by Endo. Endo shall make all payments under this Agreement free and clear of all deductions and withholdings in respect of Taxes, unless any such deduction or withholding is required by law in effect at the time of payment. Any Tax required to be withheld on amounts payable under this Agreement by Endo to RK Pharma will be paid by Endo on behalf of RK Pharma to the appropriate Governmental Authority, and Endo will furnish RK Pharma with official receipts evidencing the payment of such Tax. Any such Tax required to be withheld will be treated as having been paid to RK Pharma for all purposes of this Agreement. Notwithstanding the foregoing, prior to deducting or withholding any amounts from any payment hereunder in respect of Taxes, Endo will use commercially reasonable efforts to give advance notice to RK Pharma and take such steps as RK Pharma may reasonably request and otherwise cooperate with RK Pharma to reduce or eliminate such deduction or withholding, including by reasonably cooperating in order to execute and file any forms or certificates reasonably required to claim an available reduced rate of, or exemption from, withholding Taxes. For the avoidance of doubt, all milestone payments by Endo hereunder shall be made to RK Pharma and all payments towards Purchase Orders for API's shall be made to Apicore.

## ARTICLE 7.
## MANUFACTURING STANDARDS AND RECALLS

**7.1 Manufacturing Standards**. Each of the RK Parties hereby represents, warrants and covenants that:

7.1.1 all API that is manufactured, stored, handled, supplied and delivered to Endo shall (i) conform to the Specifications, the applicable Product Regulatory Filing, the applicable Apicore DMF, cGMP, all applicable compendial specifications (e.g., the United States Pharmacopeia), and with all Applicable Laws relating to the API, and (ii) be manufactured, packaged, tested, stored and handled in accordance with the then-current version of the applicable Product Regulatory Filing;

7.1.2 at the time of delivery in accordance with Section 5.4, all API shall have a minimum shelf life of at least seventy-five percent (75%) of its original shelf life for any commercial quantities of the API sold hereunder; provided that, the RK Parties shall use their reasonable best efforts to deliver API with minimum shelf life of at least eighty-five percent (85%) of its original shelf life;

7.1.3 all API supplied by the RK Parties hereunder will be transferred to Endo free and clear of all liens, title claims, encumbrances, and security interests;

7.1.4 the RK Parties and their Affiliates and subcontractors, shall have complied with all Applicable Laws in the conduct of all activities associated with the development, manufacture and supply of the API, transfer and validation of the manufacturing process, microbial test methods, and analytical test methods relating to the API, it being acknowledged and agreed that the RK Parties shall at all times be and remain fully responsible to Endo for all activities (actions or inactions) of any such contractor that either of the RK Parties may employ or engage as if the RK Parties had conducted such activities themselves; and

7.1.5 All deliveries of API by the RK Parties will be accompanied by all documentation required under Applicable Law and applicable Regulatory Approvals in order for Endo to release, market and sell the applicable Product in the Territory, including a Certificate of Analysis.

**7.2 Recall**. In the event that any recall of a Product shall be required by Regulatory Authorities, or Endo voluntarily determines to recall a Product or take any other market withdrawal action with respect to a Product, Endo shall conduct the recall or market withdrawal and be responsible for the overall management of such recall or market withdrawal, including dealing with Governmental Authorities and Regulatory Authorities with respect thereto. Endo shall be responsible for all recall or market withdrawal expenses, except to the extent such recall or market withdrawal results from a breach of this Agreement by the RK Parties or relates to API manufactured by the RK Parties not in accordance with the terms hereof, in which event the RK Parties, jointly and severally, shall reimburse Endo for all costs and expenses incurred by Endo or its Affiliates in connection with such recall or market withdrawal to the extent attributable to such breach or manufacture by the RK Parties.

**7.3 Quality Technical Agreement**. Within 180 days of the Effective Date, the RK Parties shall execute and deliver a quality technical agreement on terms mutually acceptable to the Parties.

## ARTICLE 8.
## AUDITS AND INSPECTION RIGHTS

**8.1 Inspections by Governmental Authorities**. During the Term, the RK Parties shall (i) advise Endo of any Governmental Authority visits to, or written inquiries about, any facilities or procedures for the manufacture, storage, or handling API within two (2) Business Days after notice of such visit or receipt of inquiry (or if no advance notice is given, then within forty-eight (48) hours after occurrence of such visit or inquiry), and (ii) furnish Endo with copies of any report or correspondence issued by or provided to any Governmental Authority in connection with such visit or inquiry and reasonably related to the API, and the RK Parties shall consider in good faith any recommendations made by Endo in connection therewith prior to responding to the applicable Governmental Authority. The RK Parties shall furnish a summary of the interaction with such Governmental Authority to Endo within five (5) Business Days after receipt of any such report or correspondence issued by or provided to the Governmental Authority in connection with such visit or inquiry. the RK Parties shall permit the relevant Governmental Authorities to inspect its facilities and records in connection with the activities contemplated by this Agreement with assistance of Endo.

**8.2 Inspections by Endo**. The RK Parties shall permit Endo, or cause Endo to be permitted, to inspect the applicable manufacturing and/or testing facilities for API during business hours, provided that Endo provides thirty (30) days' prior written notice to RK Pharma (or, in the event of a Governmental Authority visit or inspection, such shorter period of notice as appropriate under the circumstances). During any such inspection, the RK Parties shall permit Endo (or its authorized representative), or cause Endo (or such representative) to be permitted, (i) to inspect the manufacturing facilities, (ii) to inspect the quality control procedures, and/or (iii) to review any records and reports pertinent to the manufacture, disposition or transport of API as may be necessary to evidence compliance with this Agreement and/or all applicable regulations in connection with activities associated with the API, including compliance with cGMP. Notwithstanding the foregoing, (a) such inspection shall be restricted to such areas as are directly relevant to the manufacture of API and such other areas as may be otherwise authorized by the RK Parties, (b) Endo (or such representative) shall comply with all applicable written policies and procedures provided in advance by the RK Parties to Endo, and (c) at the RK Parties' option, Endo (or such representative) shall be escorted by RK Pharma or Apicore personnel. If applicable, such representative(s) shall be bound by the confidentiality provisions in this Agreement.

## ARTICLE 9.
## INTELLECTUAL PROPERTY

**9.1 Ownership**. Except as explicitly provided for in this Agreement, each Party shall own its own Intellectual Property consistent with United States or other applicable international patent, trademark, and copyright law.

9.1.1 The RK Parties hereby acknowledge and agree that Endo or its Affiliate, as applicable, is the sole and exclusive owner of the Endo Intellectual Property, the Product Regulatory Filings and the Co-Developed Intellectual Property associated with a Product. Each of the RK Parties hereby assigns, conveys and transfers to Endo its right, title and interest in and to any Co-Developed Intellectual Property associated with a Product. Each

of the RK Parties agrees to execute, or to have executed, at Endo's cost and expense (without, however, any further payment of consideration to the RK Parties), any additional documents necessary to establish, evidence, maintain or protect Endo's rights hereunder.

9.1.2 Endo hereby acknowledges and agrees that one of the RK Parties or one of their Affiliates, as applicable, is the sole and exclusive owner of the RK Parties Intellectual Property, the Apicore DMF and the Co-Developed Intellectual Property associated with the API. Each of the RK Parties hereby grants an exclusive, royalty-free, sublicensable license in the Territory to Endo to any Co-Developed Intellectual Property related to the API. Endo hereby assigns, conveys and transfers to the RK Parties its right, title and interest in and to any Co-Developed Intellectual Property associated with the API. Endo agrees to execute, or to have executed, at the RK Parties' cost and expense (without, however, any payment of consideration to Endo), any additional documents necessary to establish, evidence, maintain or protect the RK Parties' rights hereunder.

9.1.3 Each Party that owns any particular Intellectual Property shall, as between the Parties, have the sole and exclusive right to control the filing for, prosecution, maintenance and enforcement of such Intellectual Property in its sole discretion.

**9.2 Notification**. The Parties shall promptly notify each other of any allegation that any activity undertaken pursuant to this Agreement infringes or may infringe the intellectual property rights of any Third Party. Each Party shall assist and cooperate with the other Party in the defense of any suit, action or claim relating to a Product (including consenting to being named as a nominal party thereto).

**9.3 Licenses**.

9.3.1 Each of the RK Parties hereby grants to Endo and its Affiliates a non-exclusive, royalty-free, sublicensable license in the Territory during the Term, under the RK Parties Intellectual Property and the Apicore DMF to the extent related to a Product as necessary to prepare, submit, and prosecute a Product Regulatory Filing and to make, have made, import, have imported, market, have marketed, promote, have promoted, distribute, have distributed, use, sell and have sold a Product in the Territory.

9.3.2 Endo hereby grants to the RK Parties the non-exclusive, non-sublicensable, non-transferable right and license in, to and under the Co-Developed Intellectual Property related to a Product in the Territory during the Term, solely to the extent necessary to perform their obligations hereunder. The RK Parties shall authorize Endo to reference the Apicore DMF in the Product Regulatory Filings through letters of authorization.

**9.4 Intellectual Property, Regulatory and Litigation**.

9.4.1 Endo or its Affiliate shall be responsible for managing all matters related to a Product involving Regulatory Authority citizen's petitions or Regulatory Authority decisions concerning a Product or competitive products and Third Party patent rights, including defending patent litigation based on a Paragraph IV certification made by Endo or an Affiliate in respect of a Product ("**Paragraph IV Litigation**"). Endo shall control and manage such matters in its discretion and at its expense, using counsel of its choice.

9.4.2 In connection with any Paragraph IV Litigation, Endo shall be entitled to settle or compromise any claim resulting therefrom, and to enter into any agreement in respect thereof, without the RK Parties; provided, however, that a settlement or compromise that admits fault or wrongdoing on the part of the RK Parties, imposes any liability or obligation on the RK Parties damages or impose any restrictions on the conduct of business by the RK Parties or their Affiliates may not be entered into without the RK Parties' prior written consent, such consent not to be unreasonably withheld or delayed.

9.4.3 In the event that the manufacture or commercialization of the API or a Product in the Territory gives rise to an infringement proceeding against a Party and/or any of its Affiliates, licensees, agents or representatives, the Party receiving notice or whose Affiliate, licensee, agent or representative received notice of such infringement proceeding shall give prompt written notice to the other Party of the existence of such infringement proceeding. The RK Parties, with respect to the API, or Endo, with respect to a Product, shall assume control of and shall be responsible (at its own expense) for managing all aspects of the infringement claim, including but not limited to selecting counsel and settling such infringement proceeding; provided, however, the other Party shall have the right to consult with the Party controlling the defense, and may also participate in and be represented by independent counsel in such litigation, at its expense. Each Party will provide reasonable assistance in connection with the defense of such claims, including entry into a "common interest agreement" as may be appropriate and joining in any such action or providing a power of attorney. In defending such action or proceeding the controlling Party shall consult with the non-controlling Party with respect to any such action or proceeding and shall consider the non-controlling Party's position in good faith, and shall keep the non-controlling Party informed of developments in any such action or proceeding. The controlling Party shall not incur any liability to the non-controlling Party as a consequence of such proceeding or any unfavorable decision resulting therefrom, including any decision holding any of the Intellectual Property rights related to the API or a Product, as applicable, invalid or unenforceable. No settlement, consent judgment or other final disposition of an action for infringement or validity or misappropriation may be entered into as to any Intellectual Property of the non-controlling Party without the prior written consent of such Party.

## ARTICLE 10.
## CONFIDENTIALITY AND PUBLIC DISCLOSURE

**10.1 Treatment of Confidential Information**. Each Party shall retain in strict confidence and not disclose, divulge or otherwise communicate to any other Person any Confidential Information of the other Party, whether received prior to or after the Effective Date, and shall not to use any such Confidential Information for any purpose, except pursuant to the terms of, and as required to carry out such Party's obligations, under this Agreement; provided, however, that each Party may disclose Confidential Information of the other Party to the officers, directors, employees, agents, accountants, attorneys, consultants, subcontractors or other representatives of the receiving Party or its Affiliates (the "**Representatives**"), who, in each case, (a) need to know such Confidential Information for purposes of the implementation and performance by the receiving Party of this Agreement, (b) will use the Confidential Information only for such limited purposes, and (c) are bound by confidentiality obligations no less protective

than those set forth in this Agreement.

10.1.1 Each Party shall use at least the same standard of care in complying with its confidentiality obligations hereunder as it uses to protect its own Confidential Information of comparable sensitivity and to prevent and restrain the unauthorized disclosure of such Confidential Information by any of its Representatives, but no less than a reasonable standard of care. The Party receiving Confidential Information hereunder shall be jointly and severally liable for any breach by any of its Representatives of the restrictions set forth in this Agreement.

10.1.2 Without limiting the generality of any of the foregoing, the Parties shall not make any disclosure of Confidential Information that would be reasonably likely to impair the Parties' ability to obtain U.S. or foreign patents on any patentable invention or discovery described or otherwise embodied in such Confidential Information.

**10.2 Release from Restrictions**.

10.2.1 Each Party may disclose Confidential Information to the extent that such Confidential Information disclosure is made in response to a valid order of a court of competent jurisdiction or other Governmental Authority or otherwise required by law, in the opinion of counsel to the Party that has received Confidential Information of the other Party; provided, however, that such receiving Party shall immediately give as much advance notice as feasible to the Party that has disclosed such Confidential Information hereunder to give such disclosing Party a reasonable opportunity to quash such order or to obtain a protective order requiring that the Confidential Information or documents that are the subject of such order be held in confidence by such court or Governmental Authority or, if disclosed, be used only for the purposes for which the order was issued; and provided further that regardless of whether a disclosure order is quashed or a protective order is obtained, the Confidential Information disclosed in response to such court or Governmental Authority order shall be limited to that information legally required to be disclosed in response to such court or governmental order; and provided further, such Party shall, to the extent reasonably practicable and legally permitted, provide the other Party with a copy of the proposed text of such statement or disclosure (including all exhibits) sufficiently in advance of the scheduled release or publication thereof to afford such other Party a reasonable opportunity to review and comment upon the proposed text. Additionally, a Party may disclose Confidential Information to the extent such disclosure is made to (a) a Governmental Authority as required in connection with any filing, application or request for Regulatory Approval with respect to a Product or the API or (b) a Third Party to which such Party has a contractual obligation related to a Product or the API and who is bound by confidentiality obligations no less restrictive than those herein and only to the extent such information is required by such contractual obligation; provided, however, that in each case ((a) and (b)), reasonable measures shall be taken to assure confidential treatment of such information.

10.2.2 A Party may disclose this Agreement to a Third Party in connection with or in conjunction with a proposed merger, consolidation, sale of assets that include those related to this Agreement, a permitted assignment of this Agreement or loan financing,

raising of capital, or sale of securities, provided the disclosing Party obtains an agreement for confidential treatment thereof on terms no less protective than those contained herein.

**10.3 Notification**. The receiving Party shall notify the disclosing Party promptly upon discovery of any unauthorized use or disclosure of the disclosing Party's Confidential Information, and will cooperate with the disclosing Party in any reasonably requested fashion to assist the disclosing Party to regain possession of such Confidential Information and to prevent its further use or disclosure.

**10.4 No Implied Rights**. Except as otherwise set forth in this Agreement, nothing herein shall be construed as giving either Party any right, title, interest in or ownership of the Confidential Information or Intellectual Property of the other Party. For the purposes of this Agreement, specific information disclosed as part of Confidential Information shall not be deemed to be in the public domain or in the prior possession of the receiving Party merely because it is embraced by more general information in the public domain or by more general information in the prior possession of the receiving Party.

**10.5 Survival of Confidentiality Obligations**. The confidentiality obligations of the Parties contained in this Article 10 shall remain binding on both Parties following expiration or the termination of this Agreement, regardless of the cause of such expiration or termination, for fifteen (15) years after expiration or termination, which may be extended for one or more additional five (5) year periods by mutual agreement of the Parties (such agreement not to be unreasonably withheld).

**10.6 Public Announcement**. No press release, public announcement, confirmation or other communication to the public or Third Parties regarding the existence or terms of this Agreement or related matters shall be made by either Party without the prior written consent of the other Party, including with respect to the form, content and timing of such press release, public announcement, confirmation or other communication to the public or Third Parties.

**10.7 Third Party Information**.

10.7.1 The RK Parties shall not (i) violate or misappropriate the trade secrets, know-how, confidential information or knowingly violate or misappropriate any other proprietary rights of any Third Party in developing or manufacturing the API, and will not communicate any Third Party trade secrets to Endo in connection with its rights and obligations under this Agreement without receiving permission from such Third Party and informing Endo of communication of such trade secrets or (ii) provide or disclose any documents or information to Endo unless it is the owner thereof, or otherwise has the full and legal right to do so.

10.7.2 Endo shall not (i) violate or misappropriate the trade secrets, know-how, confidential information or knowingly violate or misappropriate any other proprietary rights of any Third Party in developing or manufacturing a Product, and will not communicate any Third Party trade secrets to the RK Parties in connection with its rights and obligations under this Agreement without receiving permission from such Third Party and informing the RK Parties of communication of such trade secrets or (ii) provide or

disclose any documents or information to the RK Parties unless one is the owner thereof, or otherwise has the full and legal right to do so.

**10.8 Return of Confidential Information**. Upon termination or expiration of this Agreement, or upon written request of the disclosing Party, the receiving Party shall promptly return or destroy all documents, notes and other tangible materials representing the disclosing Party's Confidential Information and all copies thereof.

**10.9 Remedies**. Each Party acknowledges and agrees that: (a) it will be impossible to measure the damages that would be suffered by the other Party if such Party fails to comply with the obligations set forth in this Article 10 and that, in the event of any such failure, the other Party will be irreparably harmed and will not have an adequate remedy at law; (b) the other Party shall, therefore, be entitled, in addition to any other rights and remedies, to seek specific performance of such Party's obligations and to obtain immediate injunctive relief without having to post a bond; and (c) such Party shall not assert, as a defense to any proceeding for such specific performance or injunctive relief, that the other Party will not be irreparably harmed or that the other Party has an adequate remedy at law.

## ARTICLE 11.
## REPRESENTATIONS AND WARRANTIES

**11.1 RK Parties Representations**. Each of the RK Parties hereby represents, warrants and covenants that:

11.1.1 it has the corporate or company power and authority to enter into and be bound by the terms and conditions of this Agreement and to perform its obligations hereunder and to execute this Agreement on behalf of itself and its Affiliates and to so bind itself and its Affiliates to the terms and conditions of this Agreement;

11.1.2 it has taken all necessary action on its part to authorize the execution and delivery of this Agreement, and this Agreement has been duly executed and delivered on behalf of it and its Affiliates and constitutes a legal, valid, binding obligation, enforceable against it and its Affiliates in accordance with its terms, subject to the effects of bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditor rights and judicial principles affecting the availability of specific performance and general principles of equity, whether enforceability is considered a proceeding at law or equity;

11.1.3 it is subject to no legal, contractual or other restrictions, limitations or conditions that conflict with its rights and obligations under this Agreement or that would reasonably be expected to affect adversely its ability to perform its obligations hereunder;

11.1.4 there is no claim, action, suit, proceeding or investigation pending or threatened against or affecting the transaction contemplated hereby;

11.1.5 the RK Parties have the right to grant the rights granted hereunder in the RK Parties Intellectual Property;

11.1.6 the development and manufacture of the API by the RK Parties has not and will not violate or misappropriate the Intellectual Property of a Third Party; and

11.1.7 neither it nor any of its Affiliates or subcontractors (a) has been debarred by a Regulatory Authority, (b) is subject to debarment by a Regulatory Authority or (c) will use, in any capacity, in connection with the activities to be performed under this Agreement, any Person who or that has been debarred, or is the subject of debarment proceedings by any Regulatory Authority; and if it learns that a Person performing on its behalf under this Agreement has been debarred by any Regulatory Authority, or has become the subject of debarment proceedings by any Regulatory Authority, it shall so promptly notify Endo and shall prohibit such Person from performing on its behalf under this Agreement.

**11.2 Endo Representations**. Endo hereby represents, warrants and covenants that:

11.2.1 Endo has the corporate power and authority to enter into and be bound by the terms and conditions of this Agreement and to perform its obligations hereunder and to execute this Agreement on behalf of itself and its Affiliates and to so bind itself and its Affiliates to the terms and conditions of this Agreement;

11.2.2 Endo has taken all necessary action on its part to authorize the execution and delivery of this Agreement, and this Agreement has been duly executed and delivered on behalf of Endo and its Affiliates and constitutes a legal, valid, binding obligation, enforceable against Endo and its Affiliates in accordance with its terms, subject to the effects of bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditor rights and judicial principles affecting the availability of specific performance and general principles of equity, whether enforceability is considered a proceeding at law or equity;

11.2.3 Endo is subject to no legal, contractual or other restrictions, limitations or conditions that conflict with its rights and obligations under this Agreement or that would reasonably be expected to affect adversely its ability to perform hereunder;

11.2.4 Endo has the right to grant the rights granted hereunder in the Endo Intellectual Property;

11.2.5 the development, manufacture and sale of the Products have not and will not violate or misappropriate the Intellectual Property of a Third Party; and

11.2.6 there is no claim, action, suit, proceeding or investigation pending or threatened against or affecting the transaction contemplated hereby.

**11.3 Compliance with Laws**.

11.3.1 **Anti-Corruption Laws**. Each Party represents and warrants to the other Party that, to the knowledge of such Party, such Party, with respect to the conduct of its business as of the Effective Date, has been and is in compliance in all material respects with all Applicable Laws. Each Party shall comply, and shall cause its employees and

subcontractors to comply, with all Applicable Laws in its performance of activities contemplated under this Agreement. Without limiting the generality of the foregoing, each Party agrees that it will comply with, and will not take any action that will cause the other Party or its Affiliates to be in breach of all Applicable Laws for the prevention of fraud, kickbacks, bribery, corruption, racketeering, money laundering or terrorism, including the FCPA, each, as amended from time to time (collectively, "**Anti-Corruption Laws**"). Each Party agrees that it has not, and covenants it will not, in connection with the performance of this Agreement, give, promise, authorize, ratify or offer, or take any act in furtherance of offering or giving anything of value, directly or indirectly: (i) to any individual, including Government Officials; or (ii) to an intermediary for payment to any individual, including Government Officials; (iii) or to any sick fund, health insurer or Healthcare Professional or employee or officer of such sick fund, health insurer or Healthcare Professional; or (iv) to any political party. It is the intent of the Parties that no payments or transfers of value shall be made, promised, authorized, ratified or offered with the purpose or effect of public or commercial bribery, acceptance or acquiescence in extortion, kickbacks or other unlawful or improper means of securing an improper advantage or obtaining or retaining business.

11.3.2 **Data Protection Laws**. Each Party represents and warrants that it will comply (and will cause its agents, accountants, attorneys, consultants, subcontractors and other representatives to comply) with all applicable Data Protection Laws and, if such Party has access to or processes Protected Personal Information of European Union citizens in connection with this Agreement, Exhibit B to this Agreement.

11.3.3 **OFAC Compliance**. Each Party acknowledges and expressly agrees that certain laws of the United States of America and other countries, including the United States Export Control Regulations, the United States Anti-Money Laundering laws, the United States Anti-Terrorism laws and the FCPA, and U.S. sanctions programs administered by the Office of Foreign Assets Control and the Bureau of Industry and Security, among others, may result in the imposition of sanctions on the other Party or its Affiliates in the event that, directly or indirectly, products are exported to or imported from, or payments are sent to or received from various countries or regions, including Iran, North Korea, Syria, Sudan, the Crimea region of Ukraine, or any country embargoed by Executive Order or otherwise, or to or from certain individuals designated or identified as sanctioned by the U.S. government, including persons in Russia and Ukraine.

11.3.4 **Compliance Event Reporting**. Each Party agrees that if it learns of any violation of Data Protection Laws, Applicable Laws, Export Control Laws or Anti-Corruption Laws by an employee or sub-contractor that performs any function under this Agreement (a "**Compliance Event**"), it will promptly notify the other Party in writing of such Compliance Event and the measures it has taken and intends to take to remedy such Compliance Event and to prevent its recurrence.

**11.4 Disclaimer**. EXCEPT FOR THE WARRANTIES AND REPRESENTATIONS PROVIDED IN THIS AGREEMENT, THE PARTIES MAKE NO OTHER WARRANTIES OR REPRESENTATIONS TO EACH OTHER, EXPRESS OR IMPLIED, INCLUDING THOSE WITH RESPECT TO THE API OR PRODUCTS, WHETHER STATUTORY OR OTHERWISE,

AND EACH PARTY SPECIFICALLY DISCLAIMS ALL OTHER WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE 12.
## INDEMNIFICATION

**12.1 Endo Indemnification by RK Parties**. Subject to Section 12.3, the RK Parties shall, jointly and severally, defend, indemnify and hold harmless each of Endo and its Affiliates, and each of their respective directors, officers and employees, from and against any and all liabilities, damages, settlements, investigations, penalties, fines, costs or expenses, including reasonable attorneys' fees and other expenses of litigation (collectively, "**Liabilities**"), arising out of or in connection with Third Party claims, suits, actions, demands or judgments to the extent relating to or arising out of (i) any breach by either of the RK Parties of any representation, warranty, undertaking, covenant or obligation under this Agreement, (ii) any negligence, gross negligence or willful misconduct by either of the RK Parties, their Affiliates or their Representatives, or (iii) a defect in the manufacturing of the API, except in each case (clause (i), (ii) or (iii)), to the extent that such Liabilities are subject to indemnification by Endo under Section 12.2.

**12.2 RK Parties Indemnification by Endo**. Subject to Section 12.3, Endo shall defend, indemnify and hold harmless the RK Parties and their Affiliates, and each of their respective directors, officers and employees, from and against any and all Liabilities arising out of or in connection with Third Party claims, suits, actions, demands or judgments to the extent relating to or arising out of (i) the promotion, distribution, marketing, labeling, packaging, sale, import or export of a Product by Endo, (ii) any breach by Endo of any representation, warranty, undertaking or covenant under this Agreement or (iii) any negligence, gross negligence or willful misconduct by Endo or its Affiliates or its Representatives, except in each case (clause (i), (ii) or (iii)), to the extent that such Liabilities are subject to indemnification by the RK Parties under Section 12.1.

**12.3 Notice and Procedures; Settlement**.

12.3.1 Each indemnified Party under this Agreement shall give the indemnifying Party prompt written notice of any claim it receives, including all particulars of such claim(s) to the extent known to the indemnified Party; provided, however, that the failure to give timely notice to the indemnifying Party as contemplated hereby shall not release the indemnifying Party from any liability to the indemnified Party, except to the extent the indemnifying Party is materially prejudiced in defending any claim by such failure. The indemnified Party shall also give the indemnifying Party the opportunity to assume sole and full control of the defense and settlement of all claims for which it is seeking indemnification. If the indemnifying Party assumes such control and defends against the Liabilities, it shall not be responsible for the legal fees of any attorneys additionally employed by the indemnified Party at its election. If the indemnifying Party refuses to defend, it shall remain liable for the legal fees of any attorneys additionally employed by the indemnified Party. The Party not assuming the defense of any such claim shall render all reasonable assistance to the Party assuming such defense.

12.3.2 Except in case the indemnifying Party refuses to fully defend and hold harmless the indemnified Party against subject losses, in no event shall the indemnified Party be entitled to settle claims subject to indemnification under this Article 12 without the consent of the indemnifying Party. The indemnifying Party may settle any claim under this Article 12 on behalf of the indemnified Party without the consent of the indemnified Party so long as the indemnified Party is not required to make any payments not covered by the indemnifying Party or to admit to any fault or wrongdoing.

## ARTICLE 13.
## TERM AND TERMINATION

**13.1 Term**. Unless earlier terminated pursuant to this Article 13, the initial term of this Agreement shall continue in force from the Effective Date for a period of fifteen (15) years (the "**Initial Term**"). Thereafter, this Agreement shall automatically renew for successive renewal terms of one (1) year each (each a "**Renewal Term**"), unless either Party gives the other Party one hundred eighty (180) days' prior written notice of non-renewal prior to the end of the Initial Term or Renewal Term, as applicable. The Initial Term plus the Renewal Term(s), if any, is referred to herein as the "**Term**".

**13.2 Termination**. This Agreement may be terminated:

13.2.1 By either Party in the event that the other Party commits a material breach of this Agreement and such breach shall not have been cured within sixty (60) days after the giving of notice of such material breach, or such extended period in the event such breach cannot be cured within sixty (60) days but such breaching Party has commenced efforts to cure such breach in a diligent manner (such period, as applicable, a "**Cure Period**"), in which case such termination will be effective immediately upon delivery after such Cure Period of written notice of termination by the non-breaching Party to the breaching Party;

13.2.2 By either Party immediately upon written notice, if the other Party at any time commences a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law or seeking the appointment of a trustee, receiver, liquidator, custodian or similar official of it or of any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall take any corporate action to authorize any of the foregoing;

13.2.3 By either Party immediately upon written notice, if the other Party at any time has an involuntary case or other proceeding commenced against it seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of ninety (90) days; or an order for relief is entered against such Party under applicable bankruptcy laws;

13.2.4 By either Party upon thirty (30) days' notice to the other Party if the other Party at any time is insolvent or is generally unable to pay its debts as they become due;

13.2.5 By Endo pursuant to Section 5.5.2;

13.2.6 By Endo upon ninety (90) days' written notice, if Endo determines, in its sole discretion, that none of the Products then on market, nor any Product then in development, is commercially viable;

13.2.7 By Endo, immediately upon written notice, if Endo reasonably determines any of the following has occurred: (i) the manufacture of the three validation batches of API (the "**Validation Batches**") and additional batches to fulfill the initial Purchase Order quantities, conforming to the required Specifications and meeting the sameness / characterization tests, is not successfully completed by the RK Parties by the delivery date set forth in the applicable Purchase Order Confirmation given an agreed lead time of eight (8) months; (ii) the sameness studies have not been successfully completed by the RK Parties in accordance with the criteria set forth on Schedule 2.1.4 within fourteen (14) weeks from completion of the Validation Batches; or (iii) an unresolvable Regulatory Authority deficiency exists with respect to the API, the Apicore DMF or any Product (to the extent related to the API) and will not be resolved in sufficient time to allow the manufacture of the API by the RK Parties or a Product by Endo for a period of more than one hundred and eighty days (180) days;

13.2.8 By Endo if either of the RK Parties or any of their Affiliates receives an FDA Notice of Adverse Findings, a warning letter, or other written correspondence from any Regulatory Authority, in each case, asserting that the operations with respect to the Facility and/or the API were not in compliance with Applicable Laws and which would prevent manufacture of the API by the RK Parties or a Product by Endo for a period of more than one hundred and eighty days (180)days; provided that, at Endo's option, in lieu of termination, Endo and its Affiliates shall be released from the purchase requirements of Section 3.2.2;

13.2.9 By the RK Parties in the event that (i) a Product Regulatory Filing has not been filed by Endo with the FDA prior to December 31, 2027; provided that such failure to timely file was not due to any delay in the RK Parties' performance of their obligations hereunder; or (ii) in response to a written inquiry from the RK Parties as to Endo's continued interest in the development of a Product, Endo provides a written response that it will not continue the development of any Product;

13.2.10 By the RK Parties pursuant to Section 3.3 or 6.3.5 (solely with respect to oral grade API);

13.2.11 By either Party upon notice to the other Party if the other Party violates Section 11.3; or

13.2.12 By either Party pursuant to Section 15.11.

**13.3 Effect of Termination.**

13.3.1 Termination of this Agreement for any reason shall be without prejudice to any legal, equitable, or administrative remedies as to which either Party is or may become entitled.

13.3.2 If the event this Agreement is terminated by Endo pursuant to Section 13.2.7, the RK Parties shall refund to Endo all Milestone Payments received hereunder within thirty (30) days of such termination.

13.3.3 Unless this Agreement is terminated by Endo pursuant to Section 13.2.1, 13.2.2, 13.2.3, 13.2.4, 13.2.5., 13.2.7, 13.2.8 or 13.2.11 (in which cases the rights and licenses granted to Endo hereunder shall automatically become perpetual but will be on a non-exclusive basis), all rights and licenses granted to Endo hereunder shall automatically terminate upon the expiration or termination of this Agreement.

**13.4 Survival**. Articles 1, 6 (with respect to amounts due as of the effective date of expiration or termination), 9, 10 and 12, Section 13.3, this Section 13.4, Articles 14 and 15, and any other provisions necessary and proper to give effect to the intention of the Parties as to the effect of this Agreement after termination shall survive any expiration of the Term or termination of this Agreement. In addition, unless otherwise expressly set forth herein, no expiration of the Term or termination of this Agreement shall have any effect on any payment or other obligation accruing or arising prior to such expiration or termination, including any damages arising from any breach hereunder.

**13.5 Intellectual Property.** Subject to Sections 9.3 and 13.3.3, all licenses and rights to licenses granted under or pursuant to this Agreement are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code (the "**Code**"), licenses of rights to "intellectual property" as defined under Section 101(35A) of the Code. Subject to Sections 9.3 and 13.3.3, Endo, as the licensee of such rights under this Agreement, shall retain and may fully exercise all of its rights and elections under the Code, and upon commencement of a bankruptcy proceeding by or against either RK Party under the Code, shall be entitled to a complete duplicate of, or complete access to (as Endo deems appropriate), any such intellectual property and all embodiments of such intellectual property. Such intellectual property and all embodiments thereof shall be promptly delivered to Endo (a) upon any such commencement of a bankruptcy proceeding upon written request therefor by Endo, unless the applicable RK Party elects to continue to perform all of its obligations under this Agreement or (b) if not delivered under (a) above, upon the rejection of this Agreement by or on behalf of an RK Party, upon written request therefor by Endo, and each Party hereby acknowledges and agrees that the foregoing shall serve as its consent to such transfer of the intellectual property and all embodiments thereof. The foregoing provisions of this Section 13.5 are without prejudice to any rights Endo may have arising under the Code or other applicable law.

## ARTICLE 14.
## INSURANCE

**14.1 Insurance**.

14.1.1 Each Party shall, at its own cost and expense, obtain and maintain in full force and effect at all times during the Term, and for a period of three (3) years thereafter:

(i) commercial general liability insurance covering bodily injury and property damage with limits of Two Million U.S. Dollars ($2,000,000) per occurrence and Five Million U.S. Dollars ($5,000,000) in the aggregate;

(ii) products and completed operations liability insurance with limits of (i) Two Million U.S. Dollars ($2,000,000) per occurrence and Ten Million U.S. Dollars ($10,000,000) in the aggregate; and

(iii) workers compensation with statutory limits as required by law and employers liability insurance with a limit of One Million U.S. Dollars ($1,000,000) per accident.

14.1.2 All of the foregoing insurance policies shall be obtained from an insurance carrier or carriers having a current A.M. Best rating of at least A- Class VIII.

14.1.3 Upon execution of this Agreement and annually thereafter, each Party shall provide to the other Party, upon request, with a certificate of insurance evidencing such coverage and naming such other Party and its Affiliates as additional insureds. Each Party shall provide the other Parties with written notice within thirty (30) days of any material change in the terms or coverage of such insurance policies or their lapse, cancellation or termination.

14.1.4 All insurance policies obtained by a Party pursuant to this Agreement shall be primary and not contributing to any other insurance, self-insurance or captive insurance maintained by the other Party to the extent of such Party's indemnification obligations hereunder; provided, however, that notwithstanding the foregoing, the insurance policies required under this Article 14 shall not be construed to limit a Party's liability with respect to its indemnification obligations under this Agreement.

## ARTICLE 15.
## MISCELLANEOUS

**15.1 Interpretation and Construction**. Unless the context of this Agreement otherwise requires, (i) the terms "include," "includes," or "including" shall be deemed to be followed by the words "without limitation" unless otherwise indicated; (ii) words using the singular or plural number shall also include the other; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement; and (iv) the terms "Article," "Section", "Schedule" and "Exhibit" refer to the specified Article, Section, Schedule and Exhibit of this Agreement. Unless otherwise expressly provided in this Agreement, the term "shall be responsible for" or the like, shall be deemed to be followed by "and shall be obligated to duly carry out such responsibility." Whenever this Agreement refers to a number of days, unless otherwise specified, such number shall refer to calendar days. The headings and paragraph captions in this Agreement are for reference and convenience purposes only and shall not affect the meaning or interpretation

of this Agreement. This Agreement shall not be interpreted or constructed in favor of or against either Party because of its effort in preparing it.

**15.2 Independent Contractor Status**. It is understood and agreed that nothing in this Agreement nor any agreements related hereto is intended to nor shall create a partnership between the Parties. The Parties hereto are independent contractors and are engaged in the operation of their own respective businesses, and neither Party hereto is to be considered the agent, partner, joint venturer or employee of the other Party for any purpose whatsoever, and neither Party shall have any authority to enter into any contracts (other than settlement agreements pursuant to the applicable provisions of this Agreement) or assume any obligations for the other Party nor make any warranties or representations on behalf of such other Party.

**15.3 Waiver and Modification**. The waiver by either Party of a breach of any provision contained herein shall be effective only if in writing and shall in no way be construed as a waiver of any succeeding breach of such provision or obligation or the waiver of the provision or obligation itself. This Agreement may not be changed, modified, amended or supplemented, except by an express written instrument signed by both Parties.

**15.4 Assignment**. This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and their respective successors and permitted assigns; provided, however, that neither Party may assign or transfer this Agreement without the prior written consent of the other Party, except that no consent shall be required if such assignment or transfer is (i) to an Affiliate of the assigning Party, or (ii) in connection with a merger or acquisition or sale of all or substantially all of the assets of the assigning Party. Any assignment or transfer in contravention of this Agreement shall be null and void *ab initio*.

**15.5 Use of Affiliates**. Unless otherwise set forth herein, each Party shall have the right to exercise its rights and perform its obligations under this Agreement either itself or through any of its Affiliates; provided, however, that whenever a Party's Affiliate is acting, or failing to act, with respect to a matter which would be within the scope of this Agreement if such action or failure to act were performed by such Party, such Party shall direct such Affiliate to perform its actions in a manner that is consistent with such Party's obligations under this Agreement and if such Affiliate acts or fails to act in a manner that would violate any obligation or condition applicable to such Party under this Agreement, such act or failure to act shall be deemed an act or failure to act of such Party. (For clarity, whenever this Agreement specifies that a Party's obligation consists of directing an Affiliate to perform or not to perform an act, the obligation that attaches to the Affiliate pursuant to the preceding sentence is the performance or nonperformance of such act, not the direction to perform or not perform it.)

**15.6 Severability**. If any provision of this Agreement shall be held illegal or unenforceable, such provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

**15.7 Further Assurances**. Each Party shall undertake and carry out its obligations in connection with this Agreement in good faith, and shall cooperate with each other in good faith throughout the performance of this Agreement. Each Party shall execute, acknowledge and deliver such further instruments and documents, and do all such other acts, as may be reasonably necessary

or appropriate, in order to carry out the purposes and intent of this Agreement. To the extent either Party incurs costs or expenses related to obligations or responsibilities of the other Party, such Party shall invoice the responsible Party for such costs and expenses, and the responsible Party shall pay the invoicing Party within thirty (30) days of receipt of such invoice.

**15.8 Use of Party's Name**. Except as otherwise required by Applicable Law, no right, express or implied, is granted by this Agreement to either Party to use in any manner the name of the other Party or any other trade name or trademark of such other Party in connection with the performance of this Agreement. For clarity, it is understood that nothing herein shall prohibit either Party from using the name of such other Party (i) in certain of such Party's disclosure documents, including those filed or disclosed in order to comply with its obligations under Applicable Law or the listing standards or agreements of any national or international securities exchange or The NASDAQ Stock Market or other similar laws of a Governmental Authority, but only to the extent that the disclosure of such other Party's name is required by Applicable Law, (ii) to respond to an inquiry of a Governmental Authority, or (iii) in a judicial, administrative or arbitration proceeding, for so long as such use of such other Party's name is limited to statements of fact and is not done in a manner to suggest or imply endorsement by such other Party.

**15.9 Notices**.

15.9.1 Any notice or other communication to be given under this Agreement by any Party to the other Party shall be in writing and shall be deemed duly given (a) on the date delivered, if personally delivered, (b) on the date sent by facsimile transmission (if transmitted before 5:00 p.m. recipient's local time on a business day, or if not, on the following business day) with automatic confirmation by the transmitting machine showing the proper number of pages were transmitted without error, (c) on the business day after being sent by Federal Express or another recognized overnight mail service which utilizes a written form of receipt for next day or next business day delivery, or (d) five (5) business days after mailing, if mailed by certified or registered mail, return receipt requested, in each case addressed to the applicable party at the address set forth below (provided, however, that a party may change its address for receiving notice by the proper giving of notice hereunder):

| | |
|---|---|
| If to Endo at: | Endo Ventures Limited<br>First Floor, Minerva House, Simmonscourt Road<br>Ballsbridge, Dublin 4, Ireland<br>Attention: Head of EVL and SVP of Supply Chain<br>Facsimile: +353 1 268 2029 |
| With a copy (which shall not constitute notice) to: | Par Pharmaceutical, Inc.<br>Six Ram Ridge Road<br>Chestnut Ridge, NY 10977<br>Attention: Chief Legal Officer<br>Facsimile Number: (845) 573-5600<br>Email: LegalNotices@endo.com |

If to either of the RK Parties: RK Pharma, Inc.,
Building 215/215A, 401
North Middletown Road,
Pearl River, New York 10965,
USA
Attention: Dr. Ravishanker Kovi
Email: Ravi@rkpharmainc.com

With a copy (which shall not constitute notice) to:

Sheppard Mullin, Richter & Hampton LLP
30 Rockefeller Plaza
New York, NY 10112
Attention: Shon Glusky
Email: sglusky@sheppardmullin.com
Facsimile: (212) 655-1717

**15.10 Governing Law and Jurisdiction**. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to the choice of law principles thereof other than those that may permit designation of New York law. The Parties irrevocably agree that the State and Federal Courts located in the State, City and County of New York, shall have exclusive jurisdiction to deal with any disputes arising out of or in connection with this Agreement and that venue is proper in such Courts. Each Party hereby expressly consents and submits to the personal jurisdiction of the Federal and State Courts in the State and County of New York.

**15.11 Force Majeure**. A Party shall not be liable for nonperformance or delay in performance to the extent that such nonperformance or delay in performance is not due to its negligence and is caused by any event reasonably beyond the control of such Party, including wars, hostilities, revolutions, riots, civil commotion, national emergency, epidemics, fire, flood, earthquake, force of nature, explosion, terrorist act, embargo, or any other Act of God, or any law, proclamation, regulation, ordinance, or other act or order of any court, Governmental Authority (each a "**Force Majeure Event**"). In the event that either Party is prevented from discharging its obligations under this Agreement on account of a Force Majeure Event, such Party shall notify the other forthwith, and shall nevertheless use Commercially Reasonable Efforts to discharge its said obligations, even if in a partial or compromised manner. If either Party is unable to perform its obligations hereunder as a result of a Force Majeure Event for a period of ninety (90) days or longer, then the other Party shall have the right, upon its issuance of notice to the other Party, to terminate this Agreement.

**15.12 Entire Agreement**. This Agreement (and any Schedules, Exhibits attached hereto) constitute the entire agreement between and among the Parties with respect to the API and supersede all prior representations, understandings and agreements with respect to the API.

**15.13 Counterparts**. This Agreement may be executed in one or more counterparts, including by transmission of facsimile or PDF copies of signature pages, each of which shall for all purposes be deemed to be an original and all of which together shall constitute one instrument.

**15.14 Third Party Beneficiaries**. Except as expressly provided herein, nothing in this Agreement, either express or implied, is intended to or shall confer upon any Third Party any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**15.15 Cumulative Rights**. The rights and remedies of each of the Parties under or pursuant to this Agreement are cumulative, may be exercised as often as such Party considers appropriate and are in addition to its rights and remedies under general law.

**15.16 Joint and Several**. Notwithstanding anything to the contrary herein, the obligations of each of the RK Parties, shall be joint and several, regardless of whether a particular provision refers to one or both of the RK Parties.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Co-Development, License and Supply Agreement to be effective as of the Effective Date.

**ENDO VENTURES LIMITED**

DocuSigned by:

By: James Papp
FA4C7A1DC00C4E9...

Name: James Papp

Title: Director

Approved by

Legal: DC

**RK PHARMA, INC.**

By: Dr. Ravi Shanker

Name: Dr. Ravishanker Kovi

Title: Executive Chairman

**APICORE PHARMACEUTICALS PVT. LTD.**

By: K. J

Name: Dr. Jayaraman Kannappan

Title: President & Director



310986676.18

**Schedule 5.1.2**

**Minimum Lead Times**

Minimum Lead Times: 1) Eight Months from the date of Purchase Order for quantities equal to or less than 500 kg

2) Ten Months for quantities greater than 500 kg

## Schedule 5.5.4

## Late Delivery Discounts

| **Delay in Delivery** | **Percentage Reduction in Supply Price** |
|---|---|
| 30-45 days | 5% |
| 46-60 days | 10% |
| 61-90 days | 20% |
| more than 90 days | 30% and Endo has the rights set forth in Section 5.6.1 |

**Schedule 2.1.4**

**Sameness Criteria**

- Apicore shall evaluate impact of KSM lots of sameness, since KSM is of natural origin, at-least 3 lots of KSM to be evaluated.
- Apicore shall share the COA and characterization data of KSM and other critical process intermediates.
- Apicore will check and revert on exclusivity of KSM with supplier.
- Apicore to share list of testing laboratories for sameness study

**Specifications:**

Apart from the API specifications provided by Apicore in the API sameness report attached hereto as Exhibit C, below are the additional requirements:

1) The limit of Loss on drying (NMT 12% w/w) needs to be more stringent. In FDA-FOI, Agency asked innovator to comment on higher result of Loss on drying (8.6%) in long term stability studies.
2) The upper limit of pH (6-11) needs to tightened. As per FDA-FOI the aq. solutions are slightly acidic (10% solution has pH of about 6.0).
3) Following tests to be included in the API specification (as per FDA-FOI and EMA-PAR).
    A. Melting point
    B. Transparency of drug substance
    C. Refractive Index
    D. Viscosity
4) Provide justification of specification for following tests.
    A. Sulfur content and sodium content
    B. Diisopropyl ether
    C. Methoxy Content and
    D. Methoxy Glucuronic Acid
5) Provide the control/one time carryover of sodium sulfate in the final API (Ref FDA-FOI).
6) Heavy metals test can be removed from specification post availability of the Elemental analysis as per ICH Q3D for parenteral dosage forms.

**API sameness study:**

1) RK Pharma to provide API sameness on minimum of three batches of the test API and three batches of the RLD.
2) The detailed extraction procedure for API extracted from RLD has to be provided.
3) RK Parties to develop and use properly validated orthogonal analytical methods wherever applicable to perform side-by-side comparative testing of the test API and the reference API.
4) Sameness of source of naturally-occurring starting material (Plant *species* sameness and Botanical raw material (BRM) sameness) should be assessed by Apicore.
   The following two criteria should be assessed to ensure botanical raw material (BRM) identity:

a. The same plant species: the BRM (beechwood) used to manufacture the proposed PPS shall be collected from the same plant species, Fagus sylvatica L. The species F. sylvatica shall be correctly identified and authenticated using appropriate analytical methods (e.g. macroscopic/microscopic and/or DNA bar-coding methods). Due to the many cultivars within this species, identification and authentication of plant species shall be conducted at the cultivar(s) level if potential cultivar(s) will be used as a natural source of the BRM.

b. BRM assessment: the plant parts (heartwood, sapwood, or outer bark etc.) used as the BRM shall be defined. The BRM shall be collected following established good agricultural and collection practices (GACP) procedures to minimize variations in BRM and eventually ensure the batch-to-batch consistency of the API. The RK Parties shall follow the Guidance for Industry: Botanical Drug Development which sets forth the FDA's current thinking on BRM quality control.

5) Physicochemical properties – The molecular weight distribution between the proposed PPS and the drug substance in the RLD shall be superimposable. Moreover, the overall structural properties or characteristic fingerprints of the proposed PPS, including (but not limited to) the degree of sulfation, sodium content, Raman and IR spectra, shall be equivalent to that of the drug substance in the RLD.

6) The monosaccharide building block composition and chain branching of the proposed PPS shall be equivalent to the drug substance in the RLD, with respect to the molecular properties, including (but not limited to) xylose units, sulfation pattern, glucuronic acid groups, linkages, and anomeric configurations. In addition, the RK Parties shall conduct a comprehensive characterization of impurity profile of the proposed drug product and the RLD.

7) Endo acknowledges that Apicore has provided IR, 1H NMR and 13C NMR spectra's of the API. Additionally, for characterization of monosaccharide building block composition and chain branching and with respect to the molecular properties, please provide the following:
    A. 2D NMR (HMBC, COSY, HSQC, TOCSY)
    B. MS (MALDI-TOF MS techniques)

Further, Apicore shall perform API sameness as per following structural techniques (Ref: FDA lit.)

| **API sameness parameters** | **Analytical Techniques used to demonstrate API sameness** |
|---|---|
| Chemical structure characterization: | A. 2D NMR (HMBC, COSY, HSQC, TOCSY)<br>B. MS (MALDI-TOF MS techniques) |
| Equivalent molecular weight distribution of PPS | A. Size exclusion chromatography e.g., Gel permeation chromatography |
| Equivalent sulfation level and pattern: | A. Quantification on ionic species: ion chromatography<br>B. Total sulfate amount |

| | |
|---|---|
| | C. 2D NMR |
| Equivalent ratio of xylose units to 4-MGA unit (branching) | A. Quantify total xylose content by acidic dehydration method (furfural)<br>B. Quantification methods: 1D NMR and 2D HSQC NMR<br>C. Quantification of carboxyl acidic group or 4-MGA (e.g., NMR) |
| Equivalent ratio of acetylated to non-acetylated branched xylose unit | A. Quantification methods: 1D NMR and 2D HSQC NMR |
| Impurity characterization and quantitation | A. Qualification and quantification using 1D and 2D NMR<br>B. LC-MS methods for building block characterization |

Additional points:

1. BET to be controlled in the API specification for injectable grade API
2. As per USP <61> for non-sterile APIs and requirement sterile product development, test for specified microorganism has to be included in the API specification.

**Information required from source of naturally-occurring starting material:**
- The supplier's contact information including phone/fax number;
- The harvesting information including characterization, harvest location, harvest time/season and post-harvest processing.
- Details of the pesticides used during harvesting. API supplier shall perform carryover of all pesticides in the final API.
- A commitment that if the vendor for this starting material is changed /added or the process of manufacturing is modified in any way, the FDA as well as Endo will be informed of the changes.

# EXHIBIT A

[RESERVED]

The Development Plan will be incorporated into this Agreement by later amendment among the Parties.

**EXHIBIT B**

DATA PROTECTION EXHIBIT

**Commission Decision C(2010)593**
**Standard Contractual Clauses (processors)**

For the purposes of Article 26(2) of Directive 95/46/EC for the transfer of personal data to processors established in third countries which do not ensure an adequate level of data protection.

Name of the data exporting organisation: Endo Ventures Limited (company registration number 534474)

Address: First Floor, Minerva House, Simmonscourt Road, Ballsbridge, Dublin 4

Tel.: +353 1 268 2000; fax +353 1 268 2029; e-mail: None

Other information needed to identify the organisation: None

(the "data exporter")

And

Name of the data importing organisations: RK Pharma, Inc. (Corporate Identification Number 6784284) and Apicore Pharmaceuticals Pvt. Ltd. (Corporate Identification Number U24119GJ2006FTC048777)

Address:401 North Middletown Road, Bldg 215/215A, Pearl River, NY-10965, USA

Tel.: +1 (732) 529 6987; fax: None; e-mail: None

Other information needed to identify the organisation: None

(collectively, the "data importer")

each, a "**party**" and together the "**parties**",

HAVE AGREED on the following Contractual Clauses (the "Clauses") in order to adduce adequate safeguards with respect to the protection of privacy and fundamental rights and freedoms of individuals for the transfer by the data exporter to the data importer of the personal data specified in Appendix 1.

*Clause 1*

***Definitions***

For the purposes of the Clauses:

(a) 'personal data', 'special categories of data', 'process/processing', 'controller', 'processor', 'data subject' and 'supervisory authority' shall have the same meaning as in Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data;

(b) 'the data exporter' means the controller who transfers the personal data;

(c) 'the data importer' means the processor who agrees to receive from the data exporter personal data intended for processing on his behalf after the transfer in accordance with his instructions and the terms of the Clauses and who is not subject to a third country's system ensuring adequate protection within the meaning of Article 25(1) of Directive 95/46/EC;

(d) 'the subprocessor' means any processor engaged by the data importer or by any other subprocessor of the data importer who agrees to receive from the data importer or from any other subprocessor of the data importer personal data exclusively intended for processing activities to be carried out on behalf of the data exporter after the transfer in accordance with his instructions, the terms of the Clauses and the terms of the written subcontract;

(e) 'the applicable data protection law' means the legislation protecting the fundamental rights and freedoms of individuals and, in particular, their right to privacy with respect to the processing of personal data applicable to a data controller in the Member State in which the data exporter is established;

(f) 'technical and organisational security measures' means those measures aimed at protecting personal data against accidental or unlawful destruction or accidental loss, alteration, unauthorised disclosure or access, in particular where the processing involves the transmission of data over a network, and against all other unlawful forms of processing.

*Clause 2*

***Details of the transfer***

The details of the transfer and in particular the special categories of personal data where applicable are specified in Appendix 1 which forms an integral part of the Clauses.

*Clause 3*

***Third-party beneficiary clause***

1. The data subject can enforce against the data exporter this Clause, Clause 4(b) to (i), Clause 5(a) to (e), and (g) to (j), Clause 6(1) and (2), Clause 7, Clause 8(2), and Clauses 9 to 12 as third-party beneficiary.

2. The data subject can enforce against the data importer this Clause, Clause 5(a) to (e) and (g), Clause 6, Clause 7, Clause 8(2), and Clauses 9 to 12, in cases where the data exporter has factually disappeared or has ceased to exist in law unless any successor entity has assumed the entire legal obligations of the data exporter by contract or by operation of law, as a result of which it takes on the rights and obligations of the data exporter, in which case the data subject can enforce them against such entity.

3. The data subject can enforce against the subprocessor this Clause, Clause 5(a) to (e) and (g), Clause 6, Clause 7, Clause 8(2), and Clauses 9 to 12, in cases where both the data exporter and the data importer have factually disappeared or ceased to exist in law or have become insolvent, unless any successor entity has assumed the entire legal obligations of the data exporter by contract or by operation of law as a result of which it takes on the rights and obligations of the data exporter, in which case the data subject can enforce them against such entity. Such third-party liability of the subprocessor shall be limited to its own processing operations under the Clauses.

4. The parties do not object to a data subject being represented by an association or other body if the data subject so expressly wishes and if permitted by national law.

*Clause 4*

***Obligations of the data exporter***

The data exporter agrees and warrants:

(a) that the processing, including the transfer itself, of the personal data has been and will continue to be carried out in accordance with the relevant provisions of the applicable data protection law (and, where applicable, has been notified to the relevant authorities of the Member State where the data exporter is established) and does not violate the relevant provisions of that State;

(b) that it has instructed and throughout the duration of the personal data processing services will instruct the data importer to process the personal data transferred only on the data exporter's behalf and in accordance with the applicable data protection law and the Clauses;

(c) that the data importer will provide sufficient guarantees in respect of the technical and organisational security measures specified in Appendix 2 to this contract;

(d) that after assessment of the requirements of the applicable data protection law, the security measures are appropriate to protect personal data against accidental or unlawful destruction or accidental loss, alteration, unauthorised disclosure or access, in particular where the processing involves the transmission of data over a network, and against all other unlawful forms of processing, and that these measures ensure a level of security appropriate to the risks presented by the processing and the nature of the data to be protected having regard to the state of the art and the cost of their implementation;

(e) that it will ensure compliance with the security measures;

(f) that, if the transfer involves special categories of data, the data subject has been informed or will be informed before, or as soon as possible after, the transfer that its data could be transmitted to a third country not providing adequate protection within the meaning of Directive 95/46/EC;

(g) to forward any notification received from the data importer or any subprocessor pursuant to Clause 5(b) and Clause 8(3) to the data protection supervisory authority if the data exporter decides to continue the transfer or to lift the suspension;

(h) to make available to the data subjects upon request a copy of the Clauses, with the exception of Appendix 2, and a summary description of the security measures, as well as a copy of any contract for subprocessing services which has to be made in accordance with the Clauses, unless the Clauses or the contract contain commercial information, in which case it may remove such commercial information;

(i) that, in the event of subprocessing, the processing activity is carried out in accordance with Clause 11 by a subprocessor providing at least the same level of protection for the personal data and the rights of data subject as the data importer under the Clauses; and

(j) that it will ensure compliance with Clause 4(a) to (i).

*Clause 5*

***Obligations of the data importer***

The data importer agrees and warrants:

(a) to process the personal data only on behalf of the data exporter and in compliance with its instructions and the Clauses; if it cannot provide such compliance for whatever reasons, it agrees to inform promptly the data exporter of its inability to comply, in which case the data exporter is entitled to suspend the transfer of data and/or terminate the contract;

(b) that it has no reason to believe that the legislation applicable to it prevents it from fulfilling the instructions received from the data exporter and its obligations under the contract and that in the event of a change in this legislation which is likely to have a substantial adverse effect on the warranties and obligations provided by the Clauses, it will promptly notify the change to the data exporter as soon as it is aware, in which case the data exporter is entitled to suspend the transfer of data and/or terminate the contract;

(c) that it has implemented the technical and organisational security measures specified in Appendix 2 before processing the personal data transferred;

(d) that it will promptly notify the data exporter about:

(i) any legally binding request for disclosure of the personal data by a law enforcement authority unless otherwise prohibited, such as a prohibition under criminal law to preserve the confidentiality of a law enforcement investigation,

(ii) any accidental or unauthorised access, and

(iii) any request received directly from the data subjects without responding to that request, unless it has been otherwise authorised to do so;

(e) to deal promptly and properly with all inquiries from the data exporter relating to its processing of the personal data subject to the transfer and to abide by the advice of the supervisory authority with regard to the processing of the data transferred;

(f) at the request of the data exporter to submit its data processing facilities for audit of the processing activities covered by the Clauses which shall be carried out by the data exporter or an inspection body composed of independent members and in possession of the required professional qualifications bound by a duty of confidentiality, selected by the data exporter, where applicable, in agreement with the supervisory authority;

(g) to make available to the data subject upon request a copy of the Clauses, or any existing contract for subprocessing, unless the Clauses or contract contain commercial information, in which case it may remove such commercial information, with the exception of Appendix 2 which shall be replaced by a summary description of the security measures in those cases where the data subject is unable to obtain a copy from the data exporter;

(h) that, in the event of subprocessing, it has previously informed the data exporter and obtained its prior written consent;

(i) that the processing services by the subprocessor will be carried out in accordance with Clause 11;

(j) to send promptly a copy of any subprocessor agreement it concludes under the Clauses to the data exporter.

*Clause 6*

***Liability***

1. The parties agree that any data subject, who has suffered damage as a result of any breach of the obligations referred to in Clause 3 or in Clause 11 by any party or subprocessor is entitled to receive compensation from the data exporter for the damage suffered.

2. If a data subject is not able to bring a claim for compensation in accordance with paragraph 1 against the data exporter, arising out of a breach by the data importer or his subprocessor of any of their obligations referred to in Clause 3 or in Clause 11, because the data exporter has factually disappeared or ceased to exist in law or has become insolvent, the data importer agrees that the data subject may issue a claim against the data importer as if it were the data exporter, unless any successor entity has assumed the entire legal obligations of the data exporter by contract of by operation of law, in which case the data subject can enforce its rights against such entity.

The data importer may not rely on a breach by a subprocessor of its obligations in order to avoid its own liabilities.

3. If a data subject is not able to bring a claim against the data exporter or the data importer referred to in paragraphs 1 and 2, arising out of a breach by the subprocessor of any of their obligations referred to in Clause 3 or in Clause 11 because both the data exporter and the data importer have factually disappeared or ceased to exist in law or have become insolvent, the subprocessor agrees that the data subject may issue a claim against the data subprocessor with regard to its own processing operations under the Clauses as if it were the data exporter or the data importer, unless any successor entity has assumed the entire legal obligations of the data exporter or data importer by contract or by operation of law, in which case the data subject can enforce its rights against such entity. The liability of the subprocessor shall be limited to its own processing operations under the Clauses.

*Clause 7*

***Mediation and jurisdiction***

1. The data importer agrees that if the data subject invokes against it third-party beneficiary rights and/or claims compensation for damages under the Clauses, the data importer will accept the decision of the data subject:

(a) to refer the dispute to mediation, by an independent person or, where applicable, by the supervisory authority;

(b) to refer the dispute to the courts in the Member State in which the data exporter is established.

2. The parties agree that the choice made by the data subject will not prejudice its substantive or procedural rights to seek remedies in accordance with other provisions of national or international law.

*Clause 8*

***Cooperation with supervisory authorities***

1. The data exporter agrees to deposit a copy of this contract with the supervisory authority if it so requests or if such deposit is required under the applicable data protection law.

2. The parties agree that the supervisory authority has the right to conduct an audit of the data importer, and of any subprocessor, which has the same scope and is subject to the same conditions as would apply to an audit of the data exporter under the applicable data protection law.

3. The data importer shall promptly inform the data exporter about the existence of legislation applicable to it or any subprocessor preventing the conduct of an audit of the data importer, or any subprocessor, pursuant to paragraph 2. In such a case the data exporter shall be entitled to take the measures foreseen in Clause 5 (b).

*Clause 9*

***Governing Law***

The Clauses shall be governed by the law of the Member State in which the data exporter is established, namely Ireland.

*Clause 10*

***Variation of the contract***

The parties undertake not to vary or modify the Clauses. This does not preclude the parties from adding clauses on business related issues where required as long as they do not contradict the Clause.

*Clause 11*

***Subprocessing***

1. The data importer shall not subcontract any of its processing operations performed on behalf of the data exporter under the Clauses without the prior written consent of the data exporter. Where the data importer subcontracts its obligations under the Clauses, with the consent of the data exporter, it shall do so only by way of a written agreement with the subprocessor which imposes the same obligations on the subprocessor as are imposed on the data importer under the Clauses. Where the subprocessor fails to fulfil its data protection obligations under such written agreement the data importer shall remain fully liable to the data exporter for the performance of the subprocessor's obligations under such agreement.

2. The prior written contract between the data importer and the subprocessor shall also provide for a third-party beneficiary clause as laid down in Clause 3 for cases where the data subject is not able to bring the claim for compensation referred to in paragraph 1 of Clause 6 against the data exporter or the data importer because they have factually disappeared or have ceased to exist in law or have become insolvent and no successor entity has assumed the entire legal obligations of the data exporter or data importer by contract or by operation of law. Such third-party liability of the subprocessor shall be limited to its own processing operations under the Clauses.

3. The provisions relating to data protection aspects for subprocessing of the contract referred to in paragraph 1 shall be governed by the law of the Member State in which the data exporter is established, namely Ireland

4. The data exporter shall keep a list of subprocessing agreements concluded under the Clauses and notified by the data importer pursuant to Clause 5 (j), which shall be updated at least once a year. The list shall be available to the data exporter's data protection supervisory authority.

*Clause 12*

***Obligation after the termination of personal data processing services***

1. The parties agree that on the termination of the provision of data processing services, the data importer and the subprocessor shall, at the choice of the data exporter, return all the personal data transferred and the copies thereof to the data exporter or shall destroy all the personal data and certify to the data exporter that it has done so, unless legislation imposed upon the data importer prevents it from returning or destroying all or part of the personal data transferred. In that case, the data importer warrants that it will guarantee the confidentiality of the personal data transferred and will not actively process the personal data transferred anymore.

2. The data importer and the subprocessor warrant that upon request of the data exporter and/or of the supervisory authority, it will submit its data processing facilities for an audit of the measures referred to in paragraph 1.

*Clause 13*

***Liability***

The parties agree that if one party is held liable for a violation of the clauses committed by the other party, the latter will, to the extent to which it is liable, indemnify the first party for any cost, charge, damages, expenses or loss it has incurred.

Indemnification is contingent upon:

(a) the data exporter promptly notifying the data importer of a claim; and

(b) the data importer being given the possibility to cooperate with the data exporter in the defence and settlement of the claim.

APPENDIX 1
TO EXHIBIT B TO THE CO-DEVELOPMENT, LICENSE AND SUPPLY AGREEMENT

This Appendix forms part of the Clauses and must be completed and signed by the parties.

**Data exporter**

The data exporter is Endo Ventures Limited, which is part of the international pharmaceutical Endo group which specialises in the development, manufacturing and commercialization of generics and specialty branded medicines. Endo may share personal data consisting of names and business telephone numbers, email addresses, and business addresses in connection with RK Pharma, Inc.'s and Apicore Pharmaceuticals Pvt. Ltd.'s performance of their development, manufacturing and supply obligations under the Agreement.

**Data importer**

The data importer is, collectively, RK Pharma, Inc. and Apicore Pharmaceuticals Pvt. Ltd. The data importer will have manufactured and supply certain drug products to data exporter and has access to employee personal data of data exporter in connection therewith.

**Data subjects**

The personal data transferred concern the following categories of data subjects:

- Employees of the data exporter

**Categories of data**

The personal data transferred concerns the following categories of data:

- Names and business telephone numbers, email addresses and business addresses

**Special categories of data (if appropriate)**

The personal data transferred concern the following special categories of data:

- None

**Processing operations**

The personal data transferred will be subject to the following basic processing activities: manufacture and supply to data importer of certain drug products.

APPENDIX 2
TO EXHIBIT B TO THE CO-DEVELOPMENT, LICENSE AND SUPPLY AGREEMENT

This Appendix forms part of the Clauses and must be completed and signed by the parties.

Description of the technical and organisational security measures implemented by the data importer in accordance with Clauses 4(d) and 5(c) (or document/legislation attached):

- Each of RK Pharma, Inc. and Apicore Pharmaceuticals Pvt. Ltd. deploys administrative, physical and technical security measures to protect the personal data described in Appendix 1 including (without implied limitation) internal operating systems that only permit properly authorised personnel to access the personal data and appropriate training to its personnel with respect to the correct handling of personal data so as to minimise the risk of security breaches and the requirements of the applicable Data Protection Laws.

**EXHIBIT C**

API SAMENESS REPORT

See attached.